# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**LILY O'FARRELL,**

   **Plaintiff,**

**vs.**         **Cause No. 1:17-cv-01052 JB/KBM**

**THE BOARD OF COMMISSIONERS
FOR THE COUNTY OF BERNALILLO,
LADONNA DAY, Individually,
KASSANDRA GARCIA, Individually, and
JOHN DOES 1-10 and JANE DOES 1-10,
Individually,**

   **Defendants.**

## PLAINTIFF'S FED. R. CIV. P. 56(d) RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON QUALIFIED IMMUNITY: DISMISSAL OF COUNTS I-V OF PLAINTIFF'S COMPLAINT

Plaintiff Lily O'Farrell, by and through her attorneys of record, Gorence & Oliveros, P.C.

(Louren Oliveros, Robert J. Gorence and Amye G. Green), hereby submits her Fed. R. Civ. P.

56(d) Response to Defendants' Motion for Summary Judgment Based on Qualified Immunity:

Dismissal of Counts I-V of Plaintiff's Complaint [Doc. 45] as follows:

### A.  INTRODUCTION AND STANDARD OF REVIEW

Under a summary judgment standard, "a court shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016) (internal

quotation marks omitted). "When applying this standard, we view the evidence and draw

reasonable inferences therefrom in light most favorable to the nonmoving party." *Id.* (internal

quotation marks omitted). "[O]n a motion for summary judgment [the Court] cannot evaluate

credibility nor can we weigh evidence." *See Nat'l Am. Ins. Co. v. Am. Re-Insurance Co.*, 358

F.3d 736, 743 (10th Cir. 2004) "When a defendant moves for summary judgment based on qualified immunity, a plaintiff must show a violation of clearly established law because, unlike most affirmative defenses, the plaintiff bears the ultimate burden of persuasion to overcome qualified immunity." *Id.* (internal quotation marks and alteration omitted). "Thus, at summary judgment, we must grant qualified immunity unless the plaintiff can show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Id.* at 900-901 (internal quotation marks omitted).

When considering a motion for summary judgment, if there is a genuine dispute as to facts, facts must be viewed in the light most favorable to the nonmoving party. *Scott v. Harris,* 550 U.S. 372, 380 (2007). "[F]acts, as accepted at the summary judgment stage of proceedings, may not be the actual facts of the case." *McCullough v. Antolini,* 559 F.3d 1201, 1202 (110th Cir. 2009) (internal citations omitted); *see also Morton,* 707 F.3d at 1278-1282 (noting the existence of strikingly different versions of the shooting and analyzing the reasonableness of the use of force under the facts most favorable to the non-movant). Where there is physical evidence supporting Plaintiff's version of the events and inconsistencies in the officer's testimony, "a jury will have to make credibility judgments, and credibility determinations should not be made on summary judgment." *Pauly v. White,* 874 F.3d 1197, 1217-18 (10th Cir. 2017), *cert denied,* 138 S. Ct. 2650, 201 L. Ed. 2d 1063 (2018) (internal citations omitted).

Plaintiff is filing a Rule 56(d) Motion for Extension of Time to Respond to Defendants' Motion for Summary Judgment contemporaneously with the instant Motion. However, should the Court determine that additional discovery is not necessary for Plaintiff to fully respond to Defendants' Motion for Summary Judgment, genuine issues of material fact exist which preclude summary judgment. Qualified immunity shields government officials from civil damages

liability *unless* the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. *Reichle v. Howards*, 132 S. Ct. 2088, 2093, 182 L. Ed. 2d 985 (2012) (citing *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011)). Viewing the evidence in the light most favorable to Plaintiff based upon the existing discovery, Defendants are not entitled to qualified immunity because at the time of the September 29, 2015 incident, Plaintiff enjoyed a clearly established right to be free from the use of excessive force by corrections officers, and those rights were violated when Defendant LaDonna Day tased Plaintiff twice in the middle of her back while Plaintiff was completely naked with her hands on the wall and tased Plaintiff on her right thigh and palm while Plaintiff clearly posed no threat to herself or others. Defendant Kassandra Garcia's failure to intervene to prevent Defendant LaDonna Day's unconstitutional actions also violated Plaintiff's clearly established rights. As such, Defendants' Motion for Summary Judgment on Qualified Immunity should be denied.

### B.    PLAINTIFF'S RESPONSE TO THE DEFENDANTS' PURPORTED STATEMENT OF "UNDISPUTED" MATERIAL FACTS

Without waiving any objections, including trial objections based upon hearsay and foundation concerning the admissibility of documents and statements, for the purpose of responding to Defendants' Motion for Summary Judgment, Plaintiff hereby responds to Defendants' purported statement of "undisputed" material facts, setting forth evidence that show the existence of triable issues of material facts:

1.      Plaintiff disputes the County Defendants' Undisputed Material Fact No. 1 (hereafter "UMF"). Plaintiff objects to the assertions in UMF No. 1 on the basis that they are inadmissible. Under the Fourth Amendment, "[e]xcessive force claims are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred." *City of L.A Cal. v. Mendez*, 137 S.Ct. 1539, 1546-1547 (2017); *White v. Pauly*, 137

S.Ct. 548, 550 (2017) ("Because this case concerns the defense of qualified immunity, however, the Court considers only the facts that were knowable to the defendant officers."). Evidence on credibility is not relevant at the motion for summary judgment stage. *See Nat'l Am. Ins. Co. v. Am. Re-Insurance Co.*, 358 F.3d 736, 743 (10th Cir. 2004) ("[O]n a motion for summary judgment we cannot evaluate credibility nor can we weigh evidence."). Defendant Day was unaware of Plaintiff's charges for forgery at the time of the strip search and use of force against Plaintiff. Doc. 45-2, Ex. B. Day Depo., at 69:19-70:18; *see also* Ex. 1, Day Depo. at 97:4-22.

2.      Plaintiff disputes UMF No. 2. Plaintiff objects to the assertions in UMF No. 2 on the basis that they are inadmissible. Plaintiff refers to and incorporates her objections, legal authorities, and arguments from Plaintiff's Response to the County Defendants' UMF No. 1. *See Valtierra v. City of Los Angeles*, 99 F. Supp. 3d 1190, 1193 (C.D. Cal. 2015) ("Thus, evidence regarding a decedent's criminal history may be relevant and admissible in an excessive force case, provided that the officers were aware of such information at the time of the incident."). Defendant Day was unaware of Plaintiff's non-violent criminal history at the time of the strip search and use of force against Plaintiff. Ex. 1, Day Depo., at 97:13-15.

3.      Plaintiff does not dispute UMF No. 3.

4.      Plaintiff disputes UMF No. 4. Plaintiff had no interaction with Maria Gutierrez prior to the body scan authorized by Sgt. Iverson and strip search by Defendants Day and Garcia. Ex. 2, O'Farrell Depo., at 129:11-15. Plaintiff did not have the ability to go into another inmate's cell, including Ms. Gutierrez's cell, because the cells were locked. *Id.* at 129:19-130:2. Plaintiff had already been through a body scanner and strip searched when she was initially booked into MDC. *Id.* at 73:8-12. No contraband was found during the initial body scan or strip search, and Plaintiff had no opportunity to get any narcotics while in the dayroom under observation. *Id.* at

130:3-10, 14-18.  It was the policy of MDC to preserve any evidence of contraband found during

a strip search of an inmate to establish chain of custody. Ex. 1, Day Depo., at 86:17-20.

Defendants have produced no photographs of the white plastic baggy of narcotics that

Defendants allege was found on Plaintiff during her second strip search by Defendants Day and

Garcia, and Plaintiff was not charged with possession of contraband after the strip search. Ex. 3,

D-202-CR-201502789 Docket.

      5.      Plaintiff does not dispute UMF No. 5.

      6.      Plaintiff disputes UMF Nos. 6 and 7 to the extent that they are offered to prove

that Ms. Gutierrez had given Plaintiff heroin prior to Defendant Day's and Garcia's strip search

of Plaintiff. Plaintiff refers to and incorporates her objections and arguments from Plaintiff's

Response to the County Defendants' UMF No. 4.

      7.      Plaintiff does not dispute UMF Nos. 8 through 14 and states that the First

Amended Complaint speaks for itself.  *See* Doc. 1-2.

      8.      Plaintiff disputes UMF No. 15. On September 29, 2015, Plaintiff was booked into

MDC, where she was sent through a body scanner and strip searched. Ex. 2, O'Farrell Depo., at

73:8-12. Plaintiff was initially strip searched in a shower room with at least two officers to

witness the strip search. *Id.* at 137:22-138:9. No contraband was found during Plaintiff's initial

body scan and strip search, and Plaintiff was placed on the dayroom floor under observation. *Id.*

at 130:3-10, 14-18.  Another inmate who was initially booked with Plaintiff, Maria Gutierrez,

was placed in a cell while Plaintiff was on the dayroom floor. *Id.* at 130:3-10. There was a

camera in the dayroom floor which allowed MDC staff to observe Plaintiff. *Id.* at 127:20-128:2;

129:11-18. Plaintiff did not have the ability to go into another inmate's cell while segregated on

the dayroom floor because the cells were locked. *Id.* at 129:19-130:2. Plaintiff had no

opportunity to get any narcotics from other inmates while in the dayroom under observation. *Id.* at 130:3-10, 14-18.  Plaintiff had no interaction with Maria Gutierrez, the inmate who allegedly accused her of having contraband, after she was placed on the dayroom floor prior to the body scan authorized by Sgt. Iverson and strip search by Defendants Day and Garcia. Ex. 2, O'Farrell Depo., at 129:11-15. After Plaintiff had been placed on the dayroom floor for about thirty minutes, Plaintiff was put through an x-ray machine for the second time to be checked for contraband. *Id.* at 126:7-16, 20-22; 132:18-22. No contraband was found during Plaintiff's second x-ray. *Id.* at 132:18-22.

Defendants LaDonna Day and Kassandra Garcia then took Plaintiff into a small segregated storage room for a second strip search. Ex. 2, O'Farrell Depo. at 132:23-25; 134:3-6. Defendant Day was unaware of Plaintiff's non-violent criminal history, including charges for forgery, prior to conducting the second strip search of Plaintiff. Ex. 1, Day Depo., at 69:18-70:2; 97:4-22. The segregated storage room had no cameras to allow for monitoring. Ex. 2, O'Farrell Depo. at 138:13-15, 19-22. It was out of the ordinary for Plaintiff to be strip searched in a segregated and windowless storage room. *Id.* at. 138:23-139:15. Plaintiff was directed to strip naked and to place her hands against a cinder block wall, which she did. *Id.* at 139:16-24. Defendant Day instructed Plaintiff to cough and squat three times. *Id.* at 141:15-20. Plaintiff complied and coughed and squatted three times. *Id.* After each cough and squat, Defendant Day asked Plaintiff to bend at the waist, bring her hand back, and pull her butt cheeks apart. *Id.* at 141:15-143:8. Defendant Day performed a visual inspection of Plaintiff's genitals during each cough and squat. *Id.* Plaintiff complied with Defendant Day's instructions. *Id.* After the third cough and squat, prior to bending at the waist, Plaintiff remained turned toward the wall and asked how many times Defendant Day was going to make her cough, squat, and bend. *Id.* at

143:5-14. Defendant Day replied, "As many as I like." *Id.* at 143:21-22. Defendant Day then asked Plaintiff to cough and squat again. *Id.* at 144:5-7.

Plaintiff turned her head slightly to respond to Defendant Day, but before Plaintiff could comply or speak, Defendant Day forcefully pushed Plaintiff against the wall, causing the right side of Plaintiff's face to strike the wall. Ex. 2, O'Farrell Depo., at 144:5-10; 144:15-145:25; 146:6-9; *see also* Ex. 5, Photographs of Pl.'s injuries taken at MDC; *see also* Doc. 54-3, Medical Clearance Form. Defendant Day then tased Plaintiff in her back without warning for five seconds in prong mode. Ex. 2, O'Farrell Depo., at 146:11- 148:18; *see also See* Doc. 45-4, Ex. D, Taser Download Log. Plaintiff did not see Defendant Day load the taser cartridge before the first tasing and had no idea Defendant Day was going to tase her in her back. Ex. 2, O'Farrell Depo. at 171:1-14. Defendant Day said nothing after tasing Plaintiff in the back and gave Plaintiff no further commands. *Id.* at 148:19-21; 149:16-22. Less than a minute later, Defendant Day tased Plaintiff in the back a second time in drive-stun mode while Plaintiff was naked with her back to Defendant Day and her hands on the wall. Ex. 2, O'Farrell Depo. at 148:19-150:3; *see also* Doc. 45-4, Ex. D, Taser Download Log.

Defendant Day then told Ms. O'Farrell to get dressed. Ex. 2, O'Farrell Depo., at 61:12-13. After Plaintiff put on her pants, Plaintiff reached for her sports bra, which was located on a table to Plaintiff's right. *Id.* at 61:14-17; 78:15-17. Defendant Day told Plaintiff that she could not have her bra. *Id.* at 61:14-17. Plaintiff then reached for her bra again, which was nowhere near where Defendant Day was standing. *Id.* at 61:22-61:1; 78:15-19. Defendant Day then tased Plaintiff in the left upper thigh without warning in drive-stun mode, causing Plaintiff's body to convulse and fall to the ground. Ex. 2, O'Farrell Depo., at 61:22-62:5; *see* Doc. 45-4, Ex. D, Taser Download Log. After Defendant Day tased Plaintiff in the thigh, Plaintiff's body began to

involuntarily convulse, and her legs were, in her words, "jittery." Ex. 2, O'Farrell Depo., at

61:22-62:5; 81:10- 82:1. Plaintiff then saw Defendant Day preparing to tase her again, and

Plaintiff put her hands up with her palms stretched outward. *Id.* at 62:3-7. Defendant Day aimed

the taser at Plaintiff and fired in prong mode just a few seconds later. *See* Doc. 45-4, Ex. D,

Taser Download Log. One of the taser's prongs struck Plaintiff in the left palm, although the

prong did not embed in her skin. Ex. 2, O'Farrell Depo., at 62:7-8; 63:8-10; 64:11-23. Plaintiff

was in a state of shock and still involuntarily convulsing when handcuffs were then placed on her

after she had been tased the fourth time. Ex. 2, O'Farrell Depo., 80:2-11; 22-23. Plaintiff was

only handcuffed after Defendant Day had tased Plaintiff four times, and thus Plaintiff's conduct

during the handcuffing did not cause or contribute to Defendant Day's use of force against

Plaintiff. *Id.* Plaintiff reported her injuries, including the injury on her palm, to Nurse Sanchez on

September 29, 2015. *Id.* at 85:18-86:24; 91:8-11, 17-19; 93:12-19. The only reason Plaintiff was

taken to medical to be examined by Nurse T. Sanchez was to be cleared for the dry cell and to be

placed as a high-risk inmate. *Id.* at 84:17-20; 87:1-3.  Nurse Sanchez removed the taser prongs

from Plaintiff, but provided no further treatment for Plaintiff's painful and obvious taser wounds.

*Id.* at 85:23- 86:3; 167:11-25.  Defendant Day acknowledged that she tased Plaintiff twice in the

back, once in the thigh, and was aiming at Plaintiff's stomach for the fourth tase. Ex. 1, Day

Depo., at 152:1-154:25; *see also* Ex. 10, Incident Taser Report.

   After Plaintiff was tased four times by Defendant Day, Defendants continued their

abusive and retaliatory behavior towards Plaintiff, Plaintiff was placed in a dry cell for five days

at Defendant Day's direction. Ex. 2, O'Farrell Depo., at 96:10-97:3; 161:2-17; Ex. 9, O'Farrell

MDC Records. Plaintiff was then placed in high-risk administrative lockdown where she was

segregated for 23 hours per day. Ex. 2, O'Farrell Depo., at 161:23-162:19; Ex. 9, O'Farrell MDC

Records. Plaintiff's wrists and ankles were shackled while she was in high-risk administrative lockdown and she suffered ankle injuries from the shackles. Ex. 2, O'Farrell Depo., at 162:6-10; *see* Ex. 6, Shackle Injury Photographs. It took Plaintiff several months to fully recover from the taser wounds, which caused her sharp and stiff pain. Ex. 2, O'Farrell Depo., at 94:2-6; 94:21-95:6. Plaintiff also experienced anxiety and trouble sleeping after being tased. *Id.* at 94:24-25. Plaintiff later requested that photographs be taken of her injuries at MDC, which were taken of her face, thigh, and back wounds. *Id.* at 88:12-15; *see also* Ex. 5, Photographs of Pl.'s injuries taken at MDC. Contrary to MDC Policy Section 9.36-4(N), effective October 1, 2014, no photographs were taken of Plaintiff's injuries on the date of the incident by an on-duty supervisor. Ex. 2, O'Farrell Depo., at 88:12-15; Ex. 7, MDC Policy Sect. 8:36-4(D). It was the policy of MDC to preserve any evidence of contraband found during a strip search of an inmate to establish chain of custody. Ex. 1, Day Depo., at 86:17-20. Defendants have produced no photographs of the white plastic baggy of narcotics that Defendants allege was found during the second strip search of Plaintiff performed by Defendants Day and Garcia, and Plaintiff was not charged with the possession of such contraband after the search. Ex. 3, D-202-CR-201502789 Docket.

9.     Plaintiff disputes UMF No. 16. Plaintiff refers to and incorporates her arguments from Plaintiff's Response to the County Defendants' UMF No. 15.

10.     Plaintiff does not dispute UMF No. 17.

11.     Plaintiff disputes UMF No. 18. Plaintiff did not testify that she saw Defendant Day reload the taser before tasering Plaintiff a second time. Ex. 1, Day Depo., at 60:19-61:2. Plaintiff was not a user of the taser, and merely testified that it was her belief that the taser needed to be reloaded for a second tase to be administered. *Id.*

12.     Plaintiff disputed UMF No. 19. Plaintiff refers to and incorporates her objections, legal authorities, and arguments from Plaintiff's Response to the County Defendants' UMF No. 15.

13.     Plaintiff disputes UMF No. 20. When Plaintiff was tased the fourth time, Defendant Day aimed the taser at Plaintiff and fired in prong mode. Ex. 1, Day Depo., at 62:7-8; 63:8-10; 64:11-23. One of the taser's prongs struck Plaintiff in the left palm but did not embed in her palm. *Id.* at 62:7-8; 63:8-10; 64:11-23.

14.     Plaintiff disputes UMF No. 21. While Plaintiff initially misspoke and stated that Defendant Day did not use physical force against her aside from the taser, Plaintiff later corrected her testimony and testified that before she was tased the first time, Defendant Day forcefully pushed Plaintiff against the wall, causing the right side of Plaintiff's face to strike the wall. Ex. 1, Day Depo., at 144:5-10; 144:15-145:25; 146:6-9. The resulting wound on the right side of Plaintiff's face was noted by Nurse T. Sanchez during her examination of Plaintiff on September 29, 2015. Doc. 54-3, Medical Clearance Form. Plaintiff later requested that photographs be taken of her injuries at MDC. Ex. 1, Day Depo., at 88:12-15. The injury to the right side of Plaintiff's face is clearly shown in the photographs that were later taken of her injuries. Ex. 1, Day Depo., at 89:13-17; *see also* Ex. 5, Photographs of Pl.'s injuries taken at MDC.

15.     Plaintiff disputes UMF No. 22. Plaintiff refers to and incorporates her objections, legal authorities, and arguments from Plaintiffs' Response to the County Defendants' UMF No. 15.

16.     Plaintiff disputes UMF No. 23. Defendant Day tased Plaintiff in the thigh, which caused Plaintiff's body to convulse. Plaintiff was in a state of shock and still involuntarily

convulsing when the handcuffs were administered after she was tased the fourth time. Ex. 2, O'Farrell Depo., 80:2-11; 22-23. Plaintiff was handcuffed *after* Defendant Day tased Plaintiff four times, and thus Plaintiff's conduct during the handcuffing did not cause or contribute to Defendant Day's use of force against Plaintiff. *Id.*

17.     Plaintiff disputes UMF No. 24 to the extent that it is misleading. Plaintiff does not recall kicking Defendant Day after being tased in the thigh. However, after Defendant Day tased Plaintiff in the thigh, Plaintiff's body began to convulse and her legs were moving involuntarily or, in her words, were "jittery." Ex. 2, O'Farrell Depo*.,* at 61:22-62:5; 81:10-82:1.

18.     Plaintiff disputes UMF No. 25. Plaintiff refers to and incorporates her objections and arguments from Plaintiffs' Response to the County Defendants' UMF No. 15.

19.     Plaintiff disputes UMF No. 27. Plaintiff refers to and incorporates her objections, legal authorities, and arguments from Plaintiff's Response to the County Defendants' UMF No. 21.

20.     Plaintiff disputes UMF No. 28 to the extent that it asserts that Plaintiff saw Defendant Day reload the taser cartridge between the second and third tasings. Plaintiff did not initially testify that she saw Defendant Day reload the taser before tasing Plaintiff a second time and a third time. Ex. 2, O'Farrell Depo., at 60:19-61:2. Plaintiff was not a user of the taser and testified that it was her belief that the taser needed to be reloaded for additional tases to be administered. *Id.* Plaintiff does not dispute that she saw Defendant Day reload the taser cartridge prior to the fourth tasing. *Id.* at 171:1-14.

21.     Plaintiff disputes UMF No. 29. Plaintiff did not see Defendant Day load the taser cartridge before the first, second, or third tasings. Ex. 2, O'Farrell Depo., at 171:1-14. Plaintiff only saw Defendant Day load the taser cartridge before the fourth tasing. *Id.* Plaintiff was not a

user of the taser and testified that it was her belief that the taser needed to be reloaded for additional tases to be administered. *Id.* at 60:19-61:2. After testifying that the prongs were used during each tasing, Plaintiff stated that she assumed that the taser could only be used in prong mode because taser prongs were later pulled out of some of her wounds. *Id.* at 171:15-19.

22.     Plaintiff does not dispute UMF Nos. 30 through 33, and states that Defendant Day's Taser Download Log speaks for itself. *See* Doc. 45-4, Ex. D, Taser Download Log.

23.     Plaintiff disputes UMF No. 34. Plaintiff refers to and incorporates her objections, legal authorities, and arguments from Plaintiff's Response to the County Defendants' UMF No. 15.

23.     Plaintiff disputes UMF Nos. 35 and 36. Plaintiff refers to and incorporates her objections, legal authorities, and arguments from Plaintiff's Response to the County Defendants' UMF No. 29. Plaintiff does not dispute that at 22:39:01, approximately 16 seconds after the first tase, the Taser was used again in drive-stun mode for a one second duration. Plaintiff also does not dispute that the Taser was used a third time at 22:39:23, approximately 22 seconds later, in drive-stun mode for a one second duration.

24.     Plaintiff does not dispute UMF Nos. 37 and 38.

25.     Plaintiff disputes UMF No. 39 to the extent that it states that the Taser Log contradicts Plaintiff 's testimony. Plaintiff refers to and incorporates her objections and arguments from Plaintiff's Response to the County Defendants' UMF Nos. 35 and 36. Plaintiff does not dispute that the Taser was used twice in prong-mode and twice in drive-stun mode.

26.     Plaintiff disputes UMF No. 40 to the extent that it states that the Taser Log contradicts Plaintiff 's testimony. Plaintiff refers to and incorporates her objections and arguments from Plaintiff's Response to the County Defendants' UMF Nos. 35 and 36.

27.     Plaintiff disputes UMF No. 41. Plaintiff refers to and incorporates her objections and arguments from Plaintiff's Response to the County Defendants' UMF Nos. 34.

28.     Plaintiff does not dispute UMF Nos. 42 and 43.

29.     Plaintiff disputes UMF Nos. 44 and 46. Plaintiff did not place her hands around her vaginal area and did not refuse Defendant Day's orders to place her hands on the wall. Ex. 2, O'Farrell Depo., at 76:1-16.

30.     Plaintiff disputes UMF Nos. 47 through 51. Plaintiff refers to and incorporates her objections, legal authorities, and arguments from Plaintiff's Response to the County Defendants' UMF No. 15.

34.     Plaintiff disputes UMF No. 52 to the extent that it asserts that Defendant Day's testimony comports with the Taser Log. Defendant Day testified that she later tased Plaintiff the third time in the thigh in prong mode; however, the third tase was in drive-stun mode. *See* Doc. 45-2, Ex. B, Day Depo., at145:6-16; *See also* Doc. 45-4, Ex. D, Taser Download Log.

35.     Plaintiff disputes UMF No. 53 to the extent that Plaintiff received full medical treatment for her injuries. The only reason Plaintiff was taken to medical was to be cleared for the dry cell and to be placed as a high-risk inmate. Ex. 2, O'Farrell Depo., at 84:17-20; 87:1-3. Nurse Sanchez removed the taser prongs from Plaintiff's thigh and back, but provided no further treatment for Plaintiff's painful and obvious taser wounds. *Id.* at 85:23-86:3; 167:11-25.

C.     **PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS IN DISPUTE**

1.     MDC Policy Sections 8.36-4(B)(2) and 8.36-4(K)(2) governing the use of tasers, effective October 1, 2014, mandate that "[b]efore using the Taser, when circumstances permit, staff must attempt to use alternatives to force, including confrontation avoidance techniques. Ex. 7. MDC Policy Sect. 8:36-4(B)(2) and (K)(2)

2.      MDC Policy Section 8.36-4(C)(4) mandates that "[a]ctivation of the Taser more than once should only be used if the inmate is still actively attempting assault or escape. If the inmate's actions are limited to resistance to being secured, staff should attempt to use other options." Ex. 7. MDC Policy Sect. 8:36-4(C)(4).

3.      MDC Policy Section 8.36-4(C)(5) cautions that "[i]n determining the need for additional energy cycles [for the Taser], security staff should be aware that an energized inmate may not be able to respond to commands during or immediately following exposure." Ex. 7. MDC Policy Sect. 8:36-4(C)(5).

4.      MDC Policy Section 8.36-4(C)(7) also mandates that "[f]ollowing a Taser CEW deployment, security staff should use a restraint technique that does not impair the inmate's ability to breathe." Ex. 7. MDC Policy Sect. 8:36-4(C)(7).

5.      MDC Policy Section 8:36(K)(1) prohibits security staff "from deploying the Taser CEW for the purpose of punishing an inmate, for discipline, to retaliate against an inmate or to maliciously or sadistically inflict pain" and provides that the Taser may not be used "punishingly for purposes of coercion...." Ex. 7. MDC Policy Sect. 8:36-4(K)(1)- (K)(1)(a).

6.      In September 2015, MDC also had a Use of Force Directive prohibiting MDC employees from deploying OC spray on inmates locked in a confinement barrier "who are not in the process of inflicting serious injury to themselves, other inmates, or damaging department property." *See* Ex. 4, April 9, 2016, Use of Force Directive

7.      The April 9, 2016 Use of Force Directive provides that "[y]elling, using profanity, banging, etc., does not require an immediate use of force to gain compliance or gain expected behaviors." *Id.*

8.      The Use of Force Directive also provides that "an inmate's simple refusal to follow commands while not actively posing a risk to staff, self, others, or damaging department property, should not be immediately exposed to OC for basic gaining of compliance." *Id.* In fact, in direct contravention of this policy, Defendant Day testified that she tased Plaintiff because she was not cooperating with her commands. *See* Ex. 1, Day Depo., at 178:2-21; 179:5-14.

9.      The Use of Force Directive also provides that "[i]f an officer's attempts to gain compliance through verbal directives/persuasion have proved ineffective, that is when officers should radio for a supervisor to respond to assist in gaining compliance without the use of force." *Id.*

10.     The Use of Force Directive further states that the "[u]se of OC in any situation when the inmate is only passively aggressive places the Officer in danger without the benefit of back up." *Id.*

11.     The Use of Force Directive also required that staff attempt to de-escalate situations with verbal communication/persuasion prior to the use of force. *Id.*

12.     Prior to the April 9, 2015 Use of Force Directive, MDC staff had a policy and practice of using force against inmates within secured confinement barriers who were not in the process of inflicting serious injury to themselves, other inmates, or damaging department property. Ex. 8, Prior Use of Force Incidents at MDC and Summary Table.

13.     Prior to the October 1, 2014 MDC Policy Sect. 8:36-4 regarding tasers and the April 9, 2015 Use of Force Directive, MDC had a policy and practice of using force against inmates to secure inmate compliance with officer commands without prior attempts to de-escalate conflicts. *Id.*

14.     MDC staff continued their policy and practice of using force against inmates within secured confinement barriers who were not in the process of inflicting serious injury to themselves, other inmates, or damaging department property after the April 9, 2015 Use of Force Directive. *Id.*

15.     MDC staff continued their policy and practice of using force against inmates to secure inmate compliance with officer commands without prior attempts to de-escalate conflict after the April 9, 2015 Use of Force Directive and after the implementation of MDC Policy Section 8:36-4. *Id.*

## D.     ARGUMENT

## I.     DEFENDANTS VIOLATED PLAINTIFF'S CLEARLY ESTABLISHED RIGHT TO BE FREE FROM EXCESSIVE FORCE FROM LAW ENFORCEMENT

### A.     Defendant LaDonna Day violated Plaintiff's clearly established right to be free from excessive force by law enforcement because Defendant LaDonna Day tased Plaintiff when she did not pose an imminent risk of harm.

Based upon the discovery provided to date, Defendant LaDonna Day violated Plaintiff's clearly established right to be free from excessive force when she tased Plaintiff when Plaintiff did not pose an imminent risk of harm. Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was a clearly established at the time of the challenged conduct. *Reichle v. Howards*, 132 S. Ct. 2088, 2093, 182 L. Ed. 2d 985 (2012) (citing *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011)).  Once the defense of qualified immunity is raised by a defendant, the plaintiff must come forward with facts or allegations sufficient to show both that the defendant's alleged conduct violated the law and that the law was clearly established when the alleged violation

occurred. *See Workman v. Jordan,* 32 F.3d 475, 479 (10th Cir. 1994), *cert. denied,* 514 U.S.

1015, 115 S.Ct. 1357, 131 L.Ed.2d 215 (1995).

In *Graham v. Connor,* the United States Supreme Court held that excessive force claims

are analyzed under the Fourth Amendment's "objective reasonableness" standard. 490 U.S. 386,

395 (1989) ("[A]ll claims that law enforcement officers have used excessive force- deadly or

not- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be

analyzed under the Fourth Amendment and its 'reasonableness standard'…"). "[T]he

reasonableness of the officer's belief as to the appropriate level of force should be judged from

that on-scene perspective." *Saucier v. Katz,* 533 U.S. 194, 205 (2001). In analyzing an officer's

request for qualified immunity in excessive force claims, "a plaintiff is required to show that the

force used was impermissible (a constitutional violation) and that objectively reasonable officers

could not have thought the force constitutionally permissible." *Cortez v. McCauley,* 478 F.3d

1108, 1128 (10th Cir. 2007); *see also Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1314 (10th Cir.

2002) (noting that the proper perspective from which to evaluate the conduct of a police officer

is that "of a reasonable officer on the scene, acknowledging that the officer may be forced to

make split-second judgments in certain difficult circumstances.").

In evaluating whether Defendants are entitled to qualified immunity, it is clearly

established that a law enforcement officer may not use force on a compliant suspect already

under the officer's control and not resisting detention or trying to flee.

In *Weigel v. Broad,* 544 F.3d 1143 (10th Cir. 2008), the Tenth Circuit recognized that:

> Reasonableness is evaluated under the totality of the circumstances approach
> which requires that we consider the following factors: the severity of the crime at
> issue, whether the suspect poses an immediate threat to the safety of the officers
> or others, and whether he is actively resisting arrest or attempting to evade by
> flight.

A non-exclusive list of factors relevant in assessing the degree of threat facing officers include:

    (1) Whether the officers ordered the suspect to drop his weapon, and the suspect's

        compliance with police commands;

    (2) Whether any hostile motions were made with the weapon towards the officers;

    (3) The distance separating the officers and the suspect; and

    (4) The manifest intentions of the suspect.

*See Estate of Larsen v. Murr,* 511 F.3d 1255, 11260 (10th Cir. 2008) (citations omitted).

It is clearly established that a law enforcement official may not use force on a compliant suspect already under the officer's control and not resisting detention or trying to flee. *Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1314-15 (10th Cir. 2002) (holding that a plaintiff's allegation that an officer who was arresting him at a mall for suspected credit card fraud pushed him ten feet into a store window and then pushed his arm up into the middle of his back while handcuffing him, despite the fact that he was passively cooperating, was sufficient to support an excessive force claim); *Dixon v. Richer,* 922 F.2d 1456, 1462-63 (10th Cir. 1991) (holding that choking a suspect who had been frisked and had his hands on a police vehicle and then hitting him with a flashlight and beating him when he was not resisting constituted excessive force); *Baker v. City of Hamilton,* 471 F.3d 601, 607 (6th Cir. 2006) (holding that it has long been established in that circuit that "the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law" and citing cases).

It is also clearly established that the use of a taser upon an individual who has not placed anyone's safety in imminent danger is a violation of the Fourth Amendment which does not entitle a law enforcement official to qualified immunity. *Casey v. City of Fed. Heights,* 509 F.3d 1278, 1286 (10th Cir. 2007) (denying qualified immunity for the use of taser without warning

when the officer did not believe the arrestee presented an immediate threat of death or serious injury to himself or others and finding it was clearly established that "it is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force- or a verbal command- could not exact compliance"); *Wate v. Kubler,* 839 F.3d 1012, 1021 (11th Cir. 2016) (continued use of a taser after a suspect had ceased resisting was excessive force); *see also Oliver v. Florino,* 586 F.3d 898, 902, 906-908 (11th Cir. 2009) (officer was not entitled to qualified immunity when he deployed a taser multiple times, even after the individual was "immobilized," "limp," and "writing in pain."); *cf Draper v. Reynolds,* 369 F.3d 1270, 1278 (11th Cir. 2004) (finding that a "single use of a taser gun causing a one-time shocking" against a "hostile" arrestee posing a threat to officers was not excessive force under the totality of the circumstances).

Viewing the facts in the light most favorable to Plaintiff, Defendant Day first shoved Plaintiff against a wall and used a taser with no warning to exact compliance from Plaintiff, who was naked with her bands against the wall with her back to Defendant Day and who posed no risk of death or serious injury to herself or others. Pl.'s Resp. to Defs' UMF No. 15; *see Casey,* 509 F.3d 1278 at 1286 (10th Cir. 2007) (denying qualified immunity for the use of taser without warning when the officer did not believe the arrestee presented an immediate threat of death or serious injury to himself or others and finding it was clearly established that "it is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force- or a verbal command- could not exact compliance"). Defendant Day gave no prior command, which would have sufficed to ensure Plaintiff's compliance. Pl.'s Resp. to Defs' UMF No. 15. Plaintiff Day then tased Plaintiff in the back again less than a minute later without warning and without giving Plaintiff further commands while Plaintiff was still naked with her hands on the

wall. *Id.* Defendant Day then tased Plaintiff in the thigh without warning to ensure her compliance with a command not to grab her sports bra, despite the fact that the bra was nowhere near Defendant Day and Plaintiff posed no risk to herself or others as she reached for it. *Id.*. Just seconds later, while Plaintiff was involuntarily convulsing from being tased in the thigh and had not been given any further commands, Defendant Day tased Plaintiff a third time in her palm while Plaintiff had her palms outstretched, pleading for Defendant Day to stop. *Id*. The fact that Defendants have produced no photographs of the alleged white plastic baggy of narcotics that they claim was found on Plaintiff during the strip search (despite their policy that such evidence be preserved), and the fact that Plaintiff was not charged with possession of such contraband after the search further supports Plaintiff's testimony. *Id*. As such, Defendant Day's use of a taser four times on Plaintiff was a clear violation of the Fourth Amendment for which Defendant Day is not entitled to qualified immunity.

**B.** **Defendant Kassandra Garcia violated Plaintiff's clearly established rights by failing to intervene to prevent Defendant Day's unconstitutional conduct.**

Defendant Kassandra Garcia violated Plaintiff's clearly established rights by failing to intervene to prevent Defendant LaDonna Day's unconstitutional use of force against Plaintiff. It is clearly established that a law enforcement official has a duty to intervene to prevent the unconstitutional use of force. *See Fogarty v. Gallegos,* 523 F.3d 11147, 1162-63 (10th Cir. 2008) (stating that "[a]n officer who fails to intervene to prevent a fellow officer's excessive use of force may be liable under § 1983" and holding that an officer who witnessed the unlawful arrest and failed to intervene was not entitled to qualified immunity); *see also Mick v. Brewer,* 76 F.3d 1127, 1136 (10th Cir. 1996) (denying qualified immunity and finding that officers failed to intervene to prevent fellow officers from using excessive force when law enforcement officers failed to prevent fellow officers from severely and unnecessarily beating the plaintiff); *see also*

*Lusby v. T.G. & Y. Stores, Inc.,* 749 F.2d 1423, 1433 (10th Cir. 1984), *vacated on other grounds,*

*City of Lawton v. Lusby,* 474 U.S. 805 (1985) (ruling that an officer who did not prevent a fellow

officer's use of allegedly excessive force against an arrestee by striking him while he was

handcuffed and then shoving him into the wall "may be liable [under § 1983] if he had the

opportunity to intervene but he failed to do so."); *see also Vondrak v. City of Las Cruces,* 535

F.3d 1198, 1210 (10th Cir. 2008) (noting that an officer had a realistic opportunity to intervene

but failed to do so given his initial "close proximity" to the suspect and "presence immediately

thereafter" and denying qualified immunity).

In this case, Defendant Garcia is not entitled to qualified immunity because a jury could

reasonably find that she failed to intervene when Defendant Day shoved Plaintiff into a cinder

block wall without warning and then tased Plaintiff without warning while she posed no risk to

herself or others. Pl's Resp. to Defs' UMF No. 15. Defendant Garcia was present in the storage

room with Defendant Day and Plaintiff and had ample opportunity to intervene to prevent

Defendant Day's unconstitutional conduct, rendering qualified immunity inappropriate. *Id.*

## III.   PLAINTIFF HAS STATED A VIABLE *MONELL* CLAIM

"A plaintiff suing a municipality under Section 1983 must show (1) that a municipal

employee committed a constitutional violation, and (2) that a municipal policy or custom was the

moving force behind the constitutional deprivation." *Myers v. Oklahoma County Bd. Of County*

*Commissioners,* 151 F.3d 1313, 1316 (10th Cir. 1998) (citing *Monell v. Dep't of Soc. Servs. Of*

*City of New York,* 436 U.S. 658, 694 (1978)). Establishing an informal policy or custom requires

that plaintiff to show that the conduct was 'widespread'- i.e. that it involved a 'series of

decisions.'" *City of St. Louis v. Prapotnik,* 485 U.S. 112, 127 (1988).

The parties are currently coordinating regarding the production of 20,000 additional documents related to complaints, grievances, investigations or reports related to the use of tasers and/or the administration of strip searches at the Bernalillo County Metropolitan Detention Center within the five years preceding the Complaint to present. The large number of documents which remain are highly relevant to Plaintiff's *Monell* claim, as they are likely to contain incidents of the unconstitutional use of tasers or force to obtain compliance after the implementation of the April 9, 2015 Use of Force Memorandum. As such, Plaintiff requires the production of, and appropriate time to review, such materials to fully respond to Defendants' Motion for Summary Judgment regarding her *Monell* claims.

Nonetheless, Plaintiff's current review of the complaints, grievances, investigations or reports related to the use of tasers and/or the administration of strip searches at the Bernalillo County Metropolitan Detention Center has yielded information establishing a pattern and practice at the MDC of the unconstitutional use of force and/or taser to obtain compliance from inmates absent risk to the inmates or staff in violation of the April 9, 2015 Use of Force Memorandum. Plaintiff has currently identified fourteen such incidents after April 9, 2015, establishing a pattern and practice of such unconstitutional use of force. *See* Ex. 8, Prior Use of Force Incidents at MDC and Summary Table. Plaintiff anticipates that the remaining 23,000 pages of responsive documents related to such MDC incidents will likely yield additional incidents which establish a pattern and practice of the unconstitutional use of force against inmates in violation of existing MDC policies, including the April 9, 2015 Use of Force Directive and MDC Policy Section 8:36-4. Pl's UMF Nos. 39-53. As such, Plaintiff has stated a viable *Monell* claim and Defendants are not entitled to judgment as a matter of law.

## IV.   PLAINTIFF HAS VIABLE CLIAMS UNDER THE NEW MEXICO TORT CLAIMS ACT

### A.   Plaintiff's assault and battery claims against the Defendants do not fail under the New Mexico Tort Claims Act.

Plaintiff has asserted viable assault and battery claims against Defendants under the New Mexico Tort Claims Act. New Mexico looks to factors similar to those in *Graham v. Connor* when evaluating common law claims of assault and battery against police officers. *See Jonas v. Bd. Of Comm'rs of Luna Cty.,* 699 F. Supp. 2d 1284, 1297 (D.N.M. 2010). The torts of assault and battery are torts under which an officer's immunity can be waived under the New Mexico Tort Claims Act. *See* NMSA 1978 §41-4-12. New Mexico courts have held that "[t]he elements of civil and criminal assault and battery are essentially identical." *State v. Ortega,* 1992-NMCA-003, ¶ 12, 113 N.M. 437, 827 P.2d 152. In *Weinstein,* the court held that for a plaintiff to state a claim for battery under the New Mexico Tort Claims Act, he or she "need only allege that the officers failed to exercise the care of reasonably prudent and qualified officers in an activity undertaken for the safety of others." 1996-NMSC-021, ¶ 23. New Mexico law only affords law enforcement officials privileges against assault and battery claims so long as they use only that force that is reasonably necessary. *See Alaniz v. Funk,* 364 P.2d 1022, 1034-46 (N.M. 1961); *see also Mead v. O'Connor,* 344 P.2d 478, 479-80 (N.M. 1959).

Here, Defendant Day used more force than was necessary when she shoved Plaintiff against a wall and used a taser with no warning to exact compliance from Plaintiff, who was naked with her bands against the wall with her back to Defendant Day and who posed no risk of death or serious injury to herself of others. Pl. UMF Nos. 14-24 ; *see Casey,* 509 F.3d 1278 at 1286 (10th Cir. 2007) (denying qualified immunity for the use of taser without warning when the officer did not believe the arrestee presented an immediate threat of death or serious injury to

himself or others and finding it was clearly established that "it is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force- or a verbal command- could not exact compliance"). She also used more force than necessary when she tased Plaintiff in the back again less than a minute later, and then tased Plaintiff in the thigh and open palm without warning. Pl. UMF Nos. 22-34. As such, Defendant Day's actions constitute assault and battery under the New Mexico Tort Claims Act and Defendants are not entitled to summary judgment on such claims.

### B. Plaintiff's recklessness, gross negligence, and negligence claims against Defendants do not fail.

Under New Mexico law, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based on a standard of reasonable care, and the breach being a cause-in-fact and proximate cause of plaintiff's damages. *See Coffrey v. United States,* 870 F.Supp.2d 1202, 1225 (D.N.M. 2012) (citing *Herrera v. Quality Pontiac,* 2003-NMSC-018, ¶ 6, 73 P.3d 181). "In New Mexico, negligence encompasses the concepts of foreseeability of harm to the person injured and of a duty of care toward that person." *Ramirez v. Armstrong,* 1983-NMSC-104, ¶ 8, 673 P.2d 822, *overruled on other grounds by Folz v. State,* 1990-1990-NMSC-075, ¶ 3, 797 P.2d 246. A finding of negligence "is dependent upon the existence of a duty on the part of the defendant." *Schear v. Bd. of County Comm'rs,* 1984-NMSC-079, ¶ 4, 687 P.2d 728. Once courts recognize that a duty exists, that duty triggers "a legal obligation to conform to a certain standard of conduct to reduce the risk of harm to an individual or class of persons." *Baxter v. Noce,* 1988-NMSC-024, ¶ 11, 752 P.2d 240. New Mexico law only affords law enforcement officials privileges against recklessness, negligence, and gross negligence claims so long as they use only that force that is reasonably necessary. *See Alaniz,* 364 P.2d at 1033-24. New Mexico Courts have held that negligence

24

claims may be brought under the New Mexico Tort Claims Act when an officer has failed to implement policies related to their use of force. *See e.g. Weinstein v. City of Santa Fe ex. rel Santa Fe Police Dep't*, 1996-NMSC-021, ¶¶ 32-33, 42 (denying motion to dismiss on negligence claim and finding that allegations "that [an officer] failed to implement policies…are sufficient to raise a cognizable claim under Section 41-4-12 for which immunity has been waived.").

As set forth above, Defendant Day used more force than necessary during the strip search of Plaintiff and failed to comply with the April 9, 2015 Use of Force Directive, and therefore Defendants are not entitled to summary judgment with regard to Plaintiff's recklessness, negligence, and gross negligence claims.

## CONCLUSION

WHEREFORE, for the reasons stated above, Plaintiff respectfully requests leave under Fed. R. Civ. P. 56(d) to conduct additional discovery to adequately respond to the present Motion and requests that this Court deny the Defendants' Motion for Summary Judgment Based on Qualified Immunity: Dismissal of Counts I-V of Plaintiff's Complaint in its entirety, and for such further and other relief as this Court deems just and proper.

Respectfully Submitted,

*/s/ Amye Green*_____
Louren Oliveros
Robert J. Gorence
Amye G. Green
GORENCE & OLIVEROS, P.C.
300 Central Avenue SW, Suite 1000E
Albuquerque, NM 87102
Telephone: (505)244-0214
Facsimile: (505)244-0888
gorence@golaw.us
oliveros@golaw.us
green@golaw.us
*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 29, 2019, I filed the foregoing pleading electronically through the Court's CM/ECF system which caused the following parties or counsel to be served by electronic means as more fully reflected on the Notice of Electronic Filing:

> Douglas E. Gardner
> Robles, Rael & Anaya
> 500 Marquette Ave., NW, Suite 700
> Albuquerque, NM  87102
> Email:  douglas@roblesrael.com
> *Attorney for Defendants*

*/s/ Amye Green*_____
Amye G. Green