## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

LILY O'FARRELL,

        Plaintiff,

vs.                                                                             No. CIV 17-1052 JB\JFR

THE BOARD OF COMMISSIONERS
FOR THE COUNTY OF BERNALILLO;
LADONNA DAY, individually;
KASSANDRA GARCIA, individually;
CITY OF ALBUQUERQUE; JOHN DOES
1-10; and JANE DOES 1-10,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) County Defendants' Motion for Summary Judgment Based on Qualified Immunity; Dismissal of Counts I-V of Plaintiff's Complaint, filed March 1, 2019 (Doc. 45)("MSJ"); and (ii) Defendants Board of Commissioners for the County of Bernalillo's, LaDonna Day's, and Kassandra Garcia's ("County Defendants") Opposed Motion to Stay Discovery Based on Qualified Immunity and to Vacate Existing Discovery Deadlines, filed March 1, 2019 (Doc. 46)("Motion to Stay").  The Court held a hearing on May 8, 2019.  <u>See</u> Clerk's Minutes at 1, filed May 8, 2019 (Doc. 67).  The primary issue are: (i) whether Defendant LaDonna Day is entitled to qualified immunity where she used a Taser on a non-resisting criminal detainee without warning; (ii) whether it was clearly established that Plaintiff Lily O'Farrell was entitled to greater medical care than she received after she was shot with the Taser; (iii) whether Defendant Board of County Commissioners for the County of Bernalillo is excused from municipal liability; (iv) whether O'Farrell's assault and battery claims fall under the New Mexico Tort Claims Act, N.M. Stat. Ann. §§ 41-4-1 to -30; and (v) whether Bernalillo County faces

supervisory liability.  The Court concludes that: (i) Day is not entitled to qualified immunity, because using a Taser against a compliant, non-resisting detainee violated clearly established law; (ii) O'Farrell was not entitled to greater medical care under clearly established law; (iii) Bernalillo County faces municipal liability; (iv) O'Farrell has pled common law assault and battery claims; and (v) the Court will not dismiss O'Farrell's claim for vicarious liability against Bernalillo County, because the facts, when viewed in the light most favorable to O'Farrell, suggest that Day committed a tort.

## FACTUAL BACKGROUND

On September 29, 2015, O'Farrell was booked into Bernalillo County Metropolitan Detention Center ("MDC"), in Albuquerque, New Mexico.  See MSJ ¶ 1, at 3 (asserting this fact)(citing Deposition of Lily O'Farrell at 55:11-19 (taken January 7, 2019), filed March 29, 2019 (Doc. 45-1)("O'Farrell Depo.")); O'Farrell Depo. at 55:20-23 (stating that O'Farrell was booked on September 29, 2015).[1]  During the booking process, O'Farrell told the processing officers that

_____

[1]O'Farrell purports to dispute the County Defendants' proffered fact.  See Plaintiff's Fed. R. Civ. P. 56(d) Response to Defendants' Motion for Summary Judgment on Qualified Immunity: Dismissal of Counts I-V of Plaintiff's Complaint ¶ 1, at 3-4, filed March 29, 2019 (Doc. 51)("Response").  O'Farrell "objects to the assertions . . . on the basis that they are inadmissible."  She argues that Courts evaluate excessive force claims "'based upon the information the officers had when the conduct occurred.'"  Response ¶ 1, at 3 (quoting Cty. of L.A., Cal. v. Mendez, 137 S. Ct. 1539, 146-47 (2017), and citing White v. Pauly, 137 S. Ct. 548, 550 (2017)).  O'Farrell also argues that credibility evidence "is not relevant at the motion for summary judgment stage," Response ¶ 1, at 4 (citing Nat'l Am. Ins. Co. v. Am. Re-Insurance Co., 358 F.3d 736, 743 (10th Cir. 2004)), and that Day was unaware of O'Farrell's forgery charge at the time of the alleged use of force, see Response ¶ 1, at 4.  The County Defendants argue in reply that O'Farrell "offers no evidence to dispute" the fact and that the Court must therefore conclude that the fact is undisputed.  County Defendants' Reply in Support of Motion for Summary Judgment Based on Qualified Immunity: Dismissal of Counts I-V of Plaintiff's Complaint ¶ 1, at 2, filed April 12, 2019 (Doc. 57)("Reply").

While O'Farrell does not offer any evidence to dispute the fact, under rule 56(c)(2) of the Federal Rules of Civil Procedures, a party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P.

she was coming down off of heroin.  See MSJ ¶ 3, at 3 (asserting this fact)(citing O'Farrell Depo. at 53:5-8; 124:13-16); Response ¶ 3, at 4 (stating that she does not dispute this fact).  Officers placed her on drug watch and put her into segregation on the dayroom floor for observation and to detox from heroin.  See MSJ ¶ 3, at 3 (asserting this fact)(citing O'Farrell Depo. at 53:5-8; 124:13-16); Response ¶ 3, at 4 (stating that she does not dispute this fact).  O'Farrell was under the influence of drugs.  See MSJ ¶ 3, at 3 (asserting this fact)(citing O'Farrell Depo. at 53:5-8; 124:13-16); Response ¶ 3, at 4 (stating that she does not dispute this fact).

Soon after she was placed in segregation, MDC officers observed O'Farrell army crawling on the floor to the cell of another inmate, Maria Gutierrez  See MSJ ¶ 4, at 3 (asserting this fact)(citing Deposition of LaDonna Day at 69:15-71:7 (taken July 23, 2018), filed March 1, 2019 (Doc. 45-2)("Day Depo.").[2]  A supervisor told Day that other corrections officers saw Gutierrez pass something to O'Farrell once she arrived at the cell.  See MSJ ¶ 4, at 3 ("Once Ms. O'Farrell arrived at the other inmate's cell, she passed something to Ms. O'Farrell.")(citing Day Depo. at 69:15-71:7); Response ¶ 4, at 4-5.[3]  O'Farrell then began crawling back to her bed, where a

---

56(c)(2).  O'Farrell appears to argue that the inadmissibility of her forgery is irrelevant.  Rule 401 of the Federal Rules of Evidence states that evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and that fact "is of consequence in determining the action."  Fed. R. Evid. 401(a)-(b).  "Irrelevant evidence is not admissible."  Fed. R. Evid. 402.  The Court has previously held, however, that a "relevance argument similarly does not dispute the fact" and that "relevance is a legal argument that is best left for the Analysis Section" of this opinion.  SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.).

[2]O'Farrell purports to dispute several proffered facts in the MSJ's ¶ 4, which is three sentences long.  See Response ¶ 4, at 4-5; MSJ ¶ 4, at 3.  O'Farrell does not, however, specifically dispute that MDC Corrections Officers saw O'Farrell army crawling on the floor to another inmate's cell, so the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[3]O'Farrell disputes the County Defendants' proffered fact, that "[o]nce O'Farrell arrived

corrections officer intercepted her and told her to put her hands on the wall while he called his supervisor.  See MSJ ¶ 4, at 3 (asserting this fact)(citing Day Depo. at 69:15-71:7); Response ¶ 4, at 4-5.[4]

Day's supervisor authorized body scans and strip searches for O'Farrell and Maria Gutierrez.  See MSJ ¶ 4, at 3 (asserting this fact)(citing Day Depo. at 69:15-71:7); Response ¶ 4, at 4-5.[5]  Day was asked to help with these strip searches.  See MSJ ¶ 5, at 3 (asserting this fact)(citing Day Depo. at 70:19-71:7); Response ¶ 5, at 5 (stating that she does not dispute this fact).  During the strip search, Gutierrez told Day that she had swallowed some heroin and given

---

at the other inmate's cell, she passed something to Ms. O'Farrell," MSJ ¶ 4, at 3, and asserts that she "had no interaction with Maria Gutierrez prior to the body scan," Response ¶ 4, at 4.  The Court agrees with the County Defendants that her response "does not create a dispute as to the underlying reasons why the strip search was authorized or indeed that a strip search was requested."  Reply ¶ 4, at 2.  The Court nevertheless alters the proffered fact to better reflect the record.  Day only stated that she was told that other officers saw O'Farrell receive something from Gutierrez.  See Day Depo. at 70:11-15.  The record does not support that O'Farrell actually did receive something from her.

[4]O'Farrell purports to dispute several proffered facts in the MSJ's ¶ 4.  See Response ¶ 4, at 4-5. She asserts that she had no interaction with Gutierrez before the body scan and strip search and that she had no ability to go into anyone else's cell.  See Response ¶ 4, at 4.  She then states that she had already been strip searched and body scanned when she arrived at MDC and that officers did not find any contraband on her.  See Response ¶ 4, at 4.  She states that MDC preserves contraband to establish chain of custody but that the County Defendants have not produced any photographs of the plastic bag with narcotics that they allege they found on her during her second strip search, and she was not charged with contraband possession.  See Response ¶ 4, at 5.  In her Response, O'Farrell does not, however, specifically dispute that a corrections officer intercepted O'Farrell's army-crawl and ordered her to put her hands on the wall while he called his supervisor, so the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[5]O'Farrell purports to dispute several proffered facts in the MSJ's ¶ 4.  See Response ¶ 4, at 4-5; supra n.4.  O'Farrell does not, however, dispute that Day's supervisor ordered strip searches and body scans for O'Farrell and Gutierrez, so the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

the rest she had to O'Farrell.  See MSJ ¶ 6, at 3 (asserting this fact)(citing Day Depo. at 71:21-72:6; 73:12-74:3); id. ¶ 42, at 9 (asserting this fact)(citing Day Depo. at 73:12-74:3).[6][7]

As O'Farrell's strip search began, Day instructed her about the commands Day would provide and what Day expected her to do; Day then had O'Farrell remove one article of clothing at a time.  See MSJ ¶ 43, at 9 (asserting this fact)(citing Day Depo. at 98:16-99:14); Response ¶ 28, at 13 (stating that O'Farrell does not dispute this fact).  O'Farrell took off her clothes, coughed, squatted, bent, spread her buttocks, and lifted her feet.  See MSJ ¶ 16, at 5 (asserting this fact)(citing O'Farrell Depo. at 59:11-60:7).[8]  Shortly before Day Tasered O'Farrell, O'Farrell

---

[6]The County Defendants have organized the MSJ's undisputed material fact section in an unorthodox manner.  The County Defendants state seven facts concerning what O'Farrell's complaint alleges under the header "Plaintiff's first version of the strip search as stated in her Complaint."  MSJ at 4.  See id. ¶¶ 8-14, at 4-5.  Next, the County Defendants state sixteen facts concerning what O'Farrell stated in her deposition under the header the "Plaintiff's second version of the strip search as described during her deposition."  MSJ at 5.  See id. ¶¶ 15-30, at 5-7.  After providing eleven facts from Day's Taser Log, see MSJ ¶¶ 31-41, at 7-9, the County Defendants state twelve facts concerning Day's version of events under the header "Sgt. Day's version of the strip search as stated during her deposition," MSJ at 9.  See id.  ¶¶ 42-53, at 9-11.  Instead of providing the Court with what O'Farrell and Day indisputably agree, the MSJ's effect is to provide the Court with what each witness to the incident indisputably said at her deposition.  This approach has led to overlapping facts that, in the interest of clarity and brevity, the Court has attempted to combine.

[7]O'Farrell disputes MSJ ¶ 6, at 3, "to the extent that [it is] offered to prove that Ms. Gutierrez had given Plaintiff heroin prior to Defendant Day's and Garcia's strip search of Plaintiff."  Response ¶ 6, at 5.  O'Farrell also "refers to and incorporates her objections and arguments" from her response to MSJ ¶ 4, at 3.  Response ¶ 6, at 5.  While O'Farrell purports to dispute MSJ ¶ 6, at 3, she does not dispute MSJ ¶ 42, at 9, which states: "Prior to conducting the strip search of Plaintiff, Sgt. Day had been told by another inmate that the inmate had given drugs to Ms. O'Farrell, and she believed that Plaintiff had heroin in her possession."  Because O'Farrell does not dispute MSJ ¶ 6, at 3's, substance or MSJ ¶ 42, at 9, in any way, the Court deems the fact that Gutierrez told Day that she had given O'Farrell drugs to be undisputed.

[8]O'Farrell purports to dispute this proffered fact, and "refers to and incorporates her arguments" in response to the County Defendants proffered fact in the MSJ's ¶ 15, at 5.  Response ¶ 9, at 9.  See id. ¶ 8, at 5-9.  O'Farrell's narrative account of the strip search confirms rather than disputes this element of the Defendant's proffered fact -- that Day made O'Farrell strip naked,

placed her hands back on the wall.  See MSJ ¶ 16, at 5 (asserting this fact)(citing O'Farrell Depo. at 59:11-60:7).  O'Farrell told Day that she did not want to continue with the strip search any more.  MSJ ¶ 16, at 5 (asserting this fact)(citing O'Farrell Depo. at 59:11-60:7).[9]  O'Farrell asked Day how many times she would have to cough, squat, and bend, and Day replied: "As many as I like."  Response ¶ 8, at 6 (asserting this fact)(citing O'Farrell Depo. at 143:5-22).[10]  Before O'Farrell

---

cough, squat, bend, and spread her buttocks.  As she stated in her Response,

> Plaintiff was directed to strip naked and to place her hands against a cinder block wall, which she did.  Plaintiff complied and coughed and squatted three times.  After each cough and squat, Defendant Day asked Plaintiff to bend at the waist, bring her hand back, and pull her butt cheeks apart.

Response ¶ 8, at 6.  Accordingly, the Court deems this fact undisputed.

[9]O'Farrell purports to dispute this proffered fact, and "refers to and incorporates her arguments" in response to the County Defendants' proffered fact in the MSJ's ¶ 15, at 5.  Response ¶ 9, at 9.  See id. ¶ 8, at 5-9.  O'Farrell's Response cites a later section of her deposition where she gives a slightly different account of the strip search.  See Response ¶ 8, at 6-7 (citing O'Farrell Depo. at 143:9-144:17).  Later in her deposition, O'Farrell implies that she did not tell Day that she wanted to end the strip search.  See O'Farrell Depo. at 143:21-144:4.  Instead, O'Farrell states that she asked Day how many times she would have to squat, and Day replied: "As many as I like."  O'Farrell Depo. at 143:22.  Asked what her response to this comment was, O'Farrell testified that "I pretty much just like, you know, I didn't know what to say.  Like, you know?"  O'Farrell Depo. at 144:3-4.  O'Farrell's later description of the interaction does not contradict her earlier statement, and so the Court will read the second description as supplementing her first description.

[10]O'Farrell does not make this factual assertion in the "Plaintiff's Statement of Additional Facts in Dispute" in the Response.  Response at 13.  Instead, she makes this assertion in response to MSJ ¶ 15, at 5.  See Response ¶ 8, at 6.  The County Defendants' proffered facts do not contradict specifically this statement; the portion of the Day Depo. the County Defendant's cite in the MSJ merely suggest different reasons for why the strip search escalated.  See MSJ ¶¶ 44-49, at 9-10 (discussing Day's orders to O'Farrell to stop pushing an object into her vagina and O'Farrell's disregard of those orders).  On a summary judgment motion, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. 242, 255 (1986)("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citation omitted)).  Accordingly, the Court will adopt this assertion as fact for this motion's purposes.

could respond, Day shoved her against the wall, causing the right side of O'Farrell's face to strike the wall.  See Response ¶ 8, at 6 (asserting this fact)(citing O'Farrell Depo. at 144:5-145:25).[11] Day did not have out or brandish the Taser before firing it at O'Farrell, and she fired it at O'Farrell without warning.  See MSJ ¶ 17, at 5 (asserting this fact)(citing O'Farrell Depo. at 170:3-12); Response ¶ 10, at 9 (stating that she does not dispute this fact).[12]  Day said nothing to O'Farrell after Tasering her for the first time, but less than a minute later, she Tasered O'Farrell in the back a second time.  See Response ¶ 8, at 7 (asserting this fact)(citing O'Farrell Depo. at 148:19-21; id.

---

[11]The County Defendants' description of the events surrounding O'Farrell's strip search differs substantially from O'Farrell's version.  In Day's Deposition, she stated that, early during the search, O'Farrell took a hand off the wall and attempted to push something into her vagina; Day stated that she told O'Farrell to stop, but O'Farrell continued her attempts.  See MSJ ¶¶ 44-46, at 9-10 (asserting this fact)(citing Day Depo. at 100:19-104:15; id. at 108:13-109:6).  After O'Farrell's fourth attempt, Day grabbed O'Farrell's arm "and a struggle ensued."  MSJ ¶ 47, at 10 (asserting this fact)(citing Day Depo. at 126:16-128:21).  Day then armed her Taser and warned O'Farrell that, if she did not stop struggling, Day would tase her.  See MSJ ¶ 48, at 10 (asserting this fact)(citing Day Depo. at 129:2-130:1).  When O'Farrell continued to struggle, Day gave another warning and then Tased O'Farrell in the back.  See MSJ ¶ 49, at 10 (asserting this fact)(citing Day Depo. at 130:2-132:2).  It was roughly thirty seconds between the time Day armed her Taser and attempted to handcuff O'Farrell and the first use of the Taser.  See MSJ ¶ 49, at 10 (asserting this fact)(citing Day Depo. at 130:2-132:2; Taser Log at 2).  On a summary judgment motion, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. at 550-55; Liberty Lobby, 477 U.S. at 255.  Where, as here, the two parties have differing accounts, the Court accepts the non-movant's version of events.  Accordingly, the Court will use O'Farrell's description of Day's first Taser use against her.

[12]The MSJ does not proffer this fact as an undisputed material fact.  The County Defendants state that it is undisputed that O'Farrell made this statement in her deposition.  See MSJ ¶ 17, at 5 (asserting this fact)(citing O'Farrell Depo. at 170:3-12).  As stated above, see supra n.11, O'Farrell's account differs from Day's account; Day stated that she brought out her Taser and then repeatedly warned O'Farrell to comply with verbal orders before shooting her.  See MSJ ¶¶ 44-46, 48, at 9-10 (citing Day Depo. at 100:19-104:15; id. at 129:2-132:2).  Where there is a dispute, the Court adopts the non-movant's version of events.  The Court, therefore, adopts MSJ ¶ 17, at 5, as an assertion of the fact that Day took out her Taser and immediately fired it without warning, rather than an assertion that O'Farrell made this statement during her deposition.

at 149:19-150:3).[13]

Day then told O'Farrell that she could dress.  See MSJ ¶ 19, at 5 (asserting this fact)(citing O'Farrell Depo. at 61:7-62:1); Response ¶ 8, at 7 ("Day then told Ms. O'Farrell to get dressed." (citing O'Farrell Depo. at 61:12-13)).[14]  While getting dressed, O'Farrell reached for her sports bra, which was nowhere near Day; Day told O'Farrell that she could not have the bra, because she was going to a dry cell.  See MSJ ¶ 19, at 5-6 (asserting this fact)(citing O'Farrell Depo. at 61:7-62:1); Response ¶ 8, at 7.[15]  O'Farrell then reached for the bra anyway, and Day Tasered her.  See

---

[13]The County Defendants present a different account of Day's second Taser use against O'Farrell.  They assert that Day testified that, after the first Tasing, "Day then tried to put Plaintiff's arms behind her back, and Ms. O'Farrell continued to struggle, and despite repeated commands to comply, Plaintiff refused to comply, and Sgt. Day drive-stun Tased Plaintiff in the back."  MSJ ¶ 50, at 10 (citing Day Depo. at 142:6-143:10).  On a summary judgment motion, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. at 550-55; Liberty Lobby, 477 U.S. at 255.  Where, as here, the two parties have differing accounts, the Court accepts the non-movant's version of events.  Accordingly, the Court will use O'Farrell's description of Day's second Taser use against her.

[14]MSJ ¶ 19, at 5-6, is framed as an assertion of what O'Farrell said in her deposition rather than what occurred.  See MSJ ¶ 19, at 5-6 ("Plaintiff testified that she was then told to put her clothes back on . . .").  Where there is a factual dispute in the record for a motion for summary judgment, the Court adopts the non-movant's version of events.  The Court, therefore, adopts MSJ ¶ 19, at 5-6, for the fact that Day then told O'Farrell to get dressed, rather than an assertion that O'Farrell made this statement during her deposition.

MSJ ¶ 19, at 5-6, contains multiple factual assertions, and the Court has broken down the paragraph across several sentences.  While O'Farrell purports to dispute MSJ ¶ 19, at 5-6, and "refers to and incorporates her objections, legal authorities, and arguments" from her objection to MSJ ¶ 15, Response ¶ 12, at 10, she does not specifically dispute this part of MSJ ¶ 19, at 5-6 -- that Day told O'Farrell to get dressed.  O'Farrell's Response agrees with this fact.  See Response ¶ 8, at 7 ("Day then told Ms. O'Farrell to get dressed." (citing O'Farrell Depo. at 61:12-13)).  Accordingly, the Court deems undisputed this part of MSJ ¶ 19, at 5-6.

[15]MSJ ¶ 19, at 5-6, is framed as an assertion of what O'Farrell said in her deposition rather than what occurred.  See MSJ ¶ 19, at 5-6 ("Plaintiff testified that she was then told to put her clothes back on . . .").  Where there is a factual dispute in the record for a motion for summary judgment, the Court adopts the non-movant's version of events.  The Court, therefore, adopts MSJ ¶ 19, at 5-6, for the fact O'Farrell reached for her sports bra, but Day told her she could not have

MSJ ¶ 19, at 6 (asserting this fact)(citing O'Farrell Depo. at 61:7-62:1).[16]  After this third Taser

use, Day fell to the ground and began to convulse.  See Response ¶ 8, at 7-8 (asserting this

fact)(citing O'Farrell Depo. at 61:22-62:5; id. at 81:10-82:1).[17]  While O'Farrell was on the

ground, Day shot the Taser at O'Farrell again; the Taser prong struck O'Farrell in the palm but did

not embed.  See MSJ ¶ 20, at 6 (asserting this fact)(citing O'Farrell Depo. at 62:3-63:7; id. at

---

it, rather than the fact that O'Farrell made this statement during her deposition.

       MSJ ¶ 19, at 5-6, contains multiple factual assertions, and the Court has broken down the paragraph across several sentences.  While O'Farrell purports to dispute MSJ ¶ 19, at 5-6, and "refers to and incorporates her objections, legal authorities, and arguments" from her objection to MSJ ¶ 15, Response ¶ 12, at 10, she does not specifically dispute this part of MSJ ¶ 19, at 5-6 -- that while getting dressed she reached for her sports bra and that Day told her she could not have it.  Accordingly, the Court deems undisputed this part of MSJ ¶ 19, at 5-6.

      [16]MSJ ¶ 19, at 5-6, is framed as an assertion of what O'Farrell said in her deposition rather than what occurred.  See MSJ ¶ 19, at 5-6 ("Plaintiff testified that she was then told to put her clothes back on . . .").  The County Defendants present a different version of the same event.  See MSJ ¶ 51, at 10.  The County Defendants state that Day testified that after she Tased O'Farrell a second time, O'Farrell "tripped and fell on the ground, and began kicking at Sgt. Day, and so Sgt. Day Tased plaintiff again."  MSJ ¶ 51, at 10.  Where there is a factual dispute in a motion for summary judgment, the Court adopts the non-movant's version of events.  The Court, therefore, adopts MSJ ¶ 19, at 5-6, for the fact that Day Tased O'Farrell after O'Farrell reached for her own bra, rather than for the fact that O'Farrell made this statement during her deposition.

       MSJ ¶ 19, at 5-6, contains multiple factual assertions, and the Court has broken the paragraph down across several sentences.  While O'Farrell purports to dispute MSJ ¶ 19, at 5-6, and "refers to and incorporates her objections, legal authorities, and arguments" from her objection to MSJ ¶ 15, at 5, Response ¶ 12, at 10, she does not specifically dispute this part of MSJ ¶ 19, at 5-6 -- that she reached for her bra after Day told her she could not have it, and Day then Tased her again.  In fact, the parties agree on this fact.  See Response ¶ 8, at 7 ("Plaintiff then reached for her bra again, which was nowhere near where Defendant Day was standing.  Defendant Day then Tased Plaintiff in the left upper thigh without warning in drive-stun mode, causing Plaintiff's body to convulse and fall to the ground." (citing O'Farrell Depo. at 61:22-62:5; id. at 78:15-19)).

      [17]The County Defendants present a different version of the same event.  They state that, in Day's Deposition, Day testified that, after she Tased O'Farrell the third time, she ordered O'Farrell to stop kicking her and Tased her again when O'Farrell continued.  See MSJ ¶ 51, at 10 (citing Day Depo. at 145:6-146:5).  Where there is a factual dispute in a motion for summary judgment, the Court adopts the non-movant's version of events.  Accordingly, the Court adopts O'Farrell's version of events surrounding Day's fourth use of her Taser.

64:11-66:23).[18]   O'Farrell was still involuntarily convulsing when she was handcuffed.   See

Response ¶ 8, at 8 (asserting this fact)(citing O'Farrell Depo. at 80:2-11; id. at 80:22-23).[19]   After

the Tasering, Day took O'Farrell to a nurse to receive medical treatment.   See MSJ ¶ 53, at 11

(asserting this fact)(citing Day Depo. at 148:4-150:1; Medical Clearance Form at 1, filed March 1,

2019 (Doc. 45-3)).[20]

Day's Taser is a model X2, which has two cartridges that can shoot prongs up to twenty-

five feet; after two shots, a user must reload the Taser.   See MSJ ¶ 32, at 8 (asserting this fact)(citing

Taser Log at 2); Response ¶ 22, at 12 (stating that she does not dispute this fact).   Day's Taser

---

[18]MSJ ¶ 20, at 6, is framed as an assertion of what O'Farrell said in her deposition, rather than what actually occurred.   See MSJ ¶ 20, at 6 ("Plaintiff testified that the third Tasing knocked her onto the ground . . .").   As discussed above in footnote 17, the Court has adopted O'Farrell's version of events for this motion's purposes.   Accordingly, the Court cites MSJ ¶ 20, at 6, for the underlying fact to which O'Farrell testified, rather than for the fact that O'Farrell made this statement during her deposition.

O'Farrell purports to dispute the Defendant's fact in MSJ ¶ 20, at 6.   See Response ¶ 13, at 10.   She asserts that, when Day fired the Taser for the fourth time, she "aimed the Taser at Plaintiff and fired in prong mode.   One of the Taser's prongs struck Plaintiff in the left palm but did not embed in her palm."   Response ¶ 13, at 10 (citations omitted).   O'Farrell's account does not differ materially from the Defendant's proffered fact, and, therefore, the Court deems MSJ ¶ 20, at 6, undisputed.

[19]O'Farrell makes this assertion in her Response.   See Response ¶ 8, at 8.   The County Defendants have provided a different account of this moment; according to the County Defendants, O'Farrell "became compliant," after Day Tased her for the fourth time.   See MSJ ¶ 51, at 10.   The County Defendants' version does not controvert specifically O'Farrell's assertion that she was convulsing when she was handcuffed, and, even if it did, where there is a factual dispute in a motion for summary judgment, the Court adopts the non-movant's version of events.   Accordingly, the Court adopts O'Farrell's version of her handcuffing.

[20]O'Farrell objects to the proffered fact "to the extent that Plaintiff received full medical treatment for her injuries" and asserts that the "only reason Plaintiff was taken to medical was to be cleared for the dry cell and to be placed as a high-risk inmate."   Response ¶ 35, at 13 (citing O'Farrell Depo. at 84:17-20; id. at 87:1-3).   The Court agrees with the County Defendants that "[t]he sufficiency of the medical care is not asserted" in the proffered fact, Reply ¶ 53, at 6, and therefore deems the fact undisputed.

could also be used in "drive-stun mode," where a user holds the Taser against the body and does not need to reload between electric shocks.  MSJ ¶ 32, at 8 (asserting this fact)(citing Taser Log at 2); Response ¶ 22, at 12 (stating that she does not dispute this fact).  Day's Taser was armed at 22:38:13 on September 29, 2015.  See MSJ ¶ 33, at 8 (asserting this fact)(citing Affidavit of LaDonna Day at 2, filed March 1, 2019 (Doc. 45-4)("Taser Log")); Response ¶ 22, at 12 (stating that she does not dispute this fact).  Thirty-two seconds after the Taser was armed, Day fired a prong and deployed a five-second tasering.  See MSJ ¶ 34, at 8 (asserting this fact)(citing Taser Log at 2).[21]  Sixteen seconds later, Day fired the Taser for a second time in "drive-stun mode" for one second.  MSJ ¶ 35, at 8 (asserting this fact)(citing Taser Log at 2); Response ¶ 23, at 12 (stating that she does not dispute this fact).  Day used the Taser a third time twenty-two seconds later in "drive-stun mode."  MSJ ¶ 36, at 8 (asserting this fact)(citing Taser Log at 2); Response ¶ 23, at 12 (stating that she does not dispute this fact).  Three seconds after that shot, at 22:39:26, Day used the Taser for the fourth time in prong-mode for five seconds.  See MSJ ¶ 37, at 8 (asserting this fact)(citing Taser Log at 2); Response ¶ 24, at 12 (stating that she does not dispute this fact).  The Taser was deactivated at 22:40:08.  See MSJ ¶ 38, at 8 (asserting this fact)(citing Taser Log at 2);

---

[21]After stating when and for how long Day's Taser fired, see MSJ ¶ 34, at 8, the County Defendants assert that the timeline "contradicts Plaintiff's testimony that Sgt. Day did not have the Taser out for any period of time, or provide a warning, before she used it."  MSJ ¶ 34, at 8. O'Farrell disputes MSJ ¶ 34, at 8.  See Response ¶ 23, at 12.  To dispute the fact, she "refers to and incorporates her objections, legal authorities, and arguments" from her response to MSJ ¶ 15. Response ¶ 23, at 12.  Her response to MSJ ¶ 15, at 5, does not dispute specifically the timeline presented in MSJ ¶ 34, at 8.  See Response ¶ 8, at 6-10.  The Court concludes that O'Farrell's objection is to the County Defendants' contention that the Taser Log contradicts her testimony that Day did not have the Taser out or warn O'Farrell before using it.  Without more information, the Taser Log does not provide the Court enough information to conclude that arming the Taser means that the Taser was unholstered and O'Farrell was warned that it could be fired.  Accordingly, the Court does not adopt the entirety of Defendants' MSJ ¶ 34, at 8, but it deems what it does adopt to be undisputed.

Response ¶ 24, at 12 (stating that she does not dispute this fact).  Day employed the Taser twice in prong-mode and twice in "drive-stun mode."  MSJ ¶ 39, at 9 (asserting this fact)(citing Taser Log at 2); Response ¶ 25, at 12 ("Plaintiff does not dispute that the Taser was used twice in prong-mode and twice in drive-stun mode."); id. ¶ 23, at 12.

MDC's Taser Policy §§ 8.36-4(B)(2) and 8.36-4(K)(2) governing the use of Tasers, effective October 1, 2014, mandate that, "[b]efore using the Taser, when circumstances permit, staff must attempt to use alternatives to force, including confrontation avoidance techniques." Response ¶ C1, at 13 (asserting this fact)(quoting MDC Taser Policy at 2, 4, filed March 29, 2019 (Doc. 51-7)("Policy")).  See Reply at 6 (stating that the County Defendants do not dispute this fact).  The Policy mandates that "[a]ctivation of the Taser more than once should only be used if the inmate is still actively attempting assault or escape.  If the inmate's actions are limited to resistance to being secured, staff should attempt to use other options."  Response ¶ C2, at 14 (asserting this fact)(quoting Policy at 3).  See Reply at 6 (stating that the County Defendants do not dispute this fact).  The Policy cautions that, "[i]n determining the need for additional energy cycles [for the Taser], security staff should be aware that an energized inmate may not be able to respond to commands during or immediately following exposure." Response ¶ C3, at 14 (asserting this fact)(quoting Policy at 3).  See Reply at 6 (stating that the County Defendants do not dispute this fact).  The Policy also mandates that, "[f]ollowing a Taser CEW[22] deployment, security staff should use a restraint technique that does not impair the inmate's ability to breathe."  Response ¶ C4, at 14 (asserting this fact)(quoting Policy at 3).  See Reply at 6 (stating that the County Defendants do not dispute this fact).  The Policy also prohibits security staff "from deploying the

_____

[22]CEW stands for Conducted Energy Weapon.

Taser CEW for the purpose of punishing an inmate, for discipline, to retaliate against an inmate, or to maliciously or sadistically inflict pain," and provides that the Taser may not be used "punishingly for purposes of coercion." Response ¶ C5, at 14 (asserting this fact)(quoting Policy at 4).  See Reply at 6 (stating that the County Defendants do not dispute this fact).

At the time of the incident between O'Farrell and Day, MDC had a Use of Force Directive prohibiting MDC employees from deploying pepper spray on inmates locked in a confinement barrier "who are not in the process of inflicting serious injury to themselves, other inmates, or damaging department property."  Response ¶ C6, at 14 (asserting this fact)(quoting Memorandum at 1 (dated April 9, 2015), filed March 29, 2019 (Doc. 51-4)("Directive").  See Reply at 6 (stating that the County Defendants do not dispute this fact).  The Directive provides that "[y]elling, using profanity, banging, etc., does not require an immediate use of force to gain compliance or gain expected behaviors."  Response ¶ C7, at 14 (asserting this fact)(quoting Directive at 1).  See Reply at 6 (stating that the County Defendants do not dispute this fact).  The Directive also provides that "an inmate's simple refusal to follow commands while not actively posing a risk to staff, self, others, or damaging department property, should not be immediately exposed to OC[23] for basic gaining of compliance."  Response ¶ C8, at 15 (asserting this fact)(quoting Directive at 1).  See Reply at 6 (stating that the County Defendants do not dispute this fact).  The Directive also provides that, "[i]f an officer's attempts to gain compliance through verbal directives/persuasion have proved ineffective, that is when officers should radio for a supervisor to respond to assist in gaining compliance without the use of force."  Response ¶ C9, at 15 (asserting this fact)(quoting Directive at 1).  See Reply at 6 (stating that the County Defendants do not dispute this fact).  The

---

[23]OC stands for oleoriesin capsicum, the active ingredient in pepper spray.

Directive further states that the "[u]se of OC in any situation when the inmate is only passively aggressive places the Officer in danger without the benefit of back up."  Response ¶ C10, at 15 (asserting this fact)(quoting Directive at 1).  See Reply at 6 (stating that the County Defendants do not dispute this fact).  Finally, the Directive also requires that staff attempt to de-escalate situations with verbal communications/persuasion prior to the use of force.  See Response ¶ C11, at 15 (asserting this fact)(citing Directive at 1).  See Reply at 6 (stating that the County Defendants do not dispute this fact).

Before April 9, 2015, MDC staff had a policy and practice of using force against inmates within secured confinement barriers who were not in the process of inflicting serious injury to themselves, other inmates, or damaging department property.  See Response ¶ C12, at 15 (asserting this fact)(citing Prior Use of Force Incidents Document at 1-2, filed March 29, 2019 (Doc. 51-8)); Reply at 6 (stating that the County Defendants do not dispute this fact).  Before October 1, 2014, MDC had a policy and practice of using force against inmates to secure inmate compliance with officer commands without prior attempts to de-escalate conflicts.  See Response ¶ C13, at 15 (asserting this fact)(citing Prior Use of Force Incidents Document at 1-2); Reply at 6 (stating that the County Defendants do not dispute this fact).  MDC staff continued their policy and practice of using force against inmates within secured confinement barriers who were not in the process of inflicting serious injury to themselves, other inmates, or damaging department property after the April 9, 2015, Use of Force Directive.  See Response ¶ C14, at 16 (asserting this fact)(citing Prior Use of Force Incidents Document); Reply at 6 (stating that the County Defendants do not dispute this fact).  MDC Staff continued their policy and practice of using force against inmates to secure compliance with officer commands without prior attempts to de-escalate conflict after the April 9, 2015, Use of Force Directive and after the implementation of MDC Policy § 8:36-4 on October 1,

2014.   See Response ¶ C15, at 16 (asserting this fact)(citing Prior Use of Force Incidents Document); Reply at 6 (stating that the County Defendants do not dispute this fact).

## PROCEDURAL BACKGROUND

O'Farrell's Complaint brings five claims.   See Complaint ¶¶ 45-89, at 6-12.   She alleges: (i) excessive force in violation of 42 U.S.C. § 1983; (ii) denial of medical care in violation of § 1983; (iii) a claim against Albuquerque and Bernalillo County under Monell v. Department of Social Services of City of New York, 446 U.S. 658 (1978); (iv) violations of the New Mexico Tort Claims Act; and (v) respondeat superior liability against Albuquerque and Bernalillo County.   See Complaint ¶¶ 45-89, at 6-12.   O'Farrell seeks "[a]ctual and compensatory damages," "[p]unitive damages on all claims allowed by law," attorney's fees, any applicable special damages, interest, and any further relief the Court finds proper.   See Complaint at 12-13.   On November 14, 2017, O'Farrell filed her Notice of Dismissal of Defendant City of Albuquerque With Prejudice, (Doc. 10), which dropped all claims against the city.

Bernalillo County, Day, and Garcia have filed for summary judgment.   See MSJ at 1.   The Court held a hearing on the MSJ on May 8, 2019.   See Clerk's Minutes at 1.   The Court stated that it would address qualified immunity's constitutional prong first before it addressed the "clearly established" prong.   Tr. at 53:23 (Court).   The Court indicated that it was inclined to grant the MSJ.   See Tr. at 53:22-55:12

### 1.      The MSJ.

The County Defendants first argue that Day and Garcia are entitled to qualified immunity, because Day's Taser use against O'Farrell did not violate clearly established rights.   See MSJ at 13-19.   The County Defendants first discuss Stevenson v. Cordova, 733 F. App'x 939 (10th Cir. 2018), a recent unpublished case from the United States Court of Appeals for the Tenth Circuit.

See MSJ at 14.  They state that, in Stevenson v. Cordova, the Tenth Circuit stated that a plaintiff must demonstrate more than "'a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives'" and must show that the government agent used force maliciously and sadistically.  MSJ at 14-15 (quoting Stevenson v. Cordova, 733 F. App'x at 943).  The County Defendants also note that the Tenth Circuit held in that case that Tasering the plaintiff "three to five times, to try to induce the plaintiff to comply with another officer's order, did not support an inference that the officer acted maliciously and sadistically to cause the plaintiff harm."  MSJ at 15.  According to the County Defendants, the Tenth Circuit also held in Stevenson v. Cordova that, even if this conduct were a constitutional violation, it was not a violation of clearly established rights.  See MSJ at 15 (citing Stevenson v. Cordova, 733 F. App'x at 944-45).

Next, the County Defendants discuss Youngquist v. Board of County Commissioners for Curry County, New Mexico, No. CIV 15-0077 BRB\SMV, 2016 WL 9725196 (D.N.M. Dec. 13, 2016)(Baldock, J.)("Youngquist").  See MSJ at 16.  The County Defendants assert that, in Youngquist the Honorable Bobby Baldock, United States Circuit Judge for the Tenth Circuit, concluded that a guard who Tasered a female inmate who did not comply with orders during a strip search did not violate clearly established rights.  See MSJ at 17 (citing Youngquist, 2016 WL 9725196, at *2).  According to the County Defendants, Judge Baldock also concluded that using a Taser on an inmate who refuses orders during a strip search is not excessive force.  See MSJ at 18 (citing Youngquist, 2016 WL 9725196, at *4).  The County Defendants then assert "that the fact that the law was not clearly established as to [the Tasering officer] also gutted Ms. Youngquist's claim that [another officer] failed to intervene because it was not clear that [the Tasering officer's] conduct in using the Taser would constitute excessive force."  MSJ at 18.  The County Defendants conclude by analogizing Youngquist to O'Farrell's case and argue that Day

- 16 -

did not violate any clearly established rights.  See MSJ at 18-19.

The County Defendants next argue that Day and Garcia are entitled to qualified immunity, because they were not deliberately indifferent to O'Farrell's medical needs.  See MSJ at 19-24.  They first assert that there is no evidence that they prevented O'Farrell from receiving medical treatment or denied her access to medical personnel.  See MSJ at 21 (citing Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980)).  They note that O'Farrell admits that she was taken to the medical ward after her strip search where a nurse monitored her vital signs and documented the minor wounds she received.  See MSJ at 22.  They state that whether additional diagnostic techniques or treatment was needed is "'a classic example of medical judgment,' which does not constitute deliberate indifference."  MSJ at 22 (quoting Estelle v. Gamble, 429 U.S. 97, 102 (1976)).

The County Defendants argue that, even if they denied O'Farrell access to medical care, Day and Garcia are still entitled to qualified immunity, because there "is no evidence in this case that would establish that County Defendants knew of a substantial risk of harm related to Plaintiff's Taser related wounds, or that County Defendants ignored the substantial risk of harm based upon the symptoms that Plaintiff was exhibiting."  MSJ at 23 (citing Estate of Booker v. Gomez, 745 F.3d 405, 431 (10th Cir. 2014)).  The County Defendants assert that the treatment they provided O'Farrell overcomes her claim for insufficient medical care.  See MSJ at 23.  They also argue that, in September, 2015, the law was not clearly established that her medical treatment -- or lack thereof -- constituted deliberate indifference.  See MSJ at 24.

The County Defendants next argue that, if the Court concludes that the County Defendants are entitled to qualified immunity for Counts I and II, then the Court must dismiss Counts III and V.  See MSJ at 24-25.  They argue that dismissing a claim against the individual defendants means O'Farrell cannot assert her Count III claim against Bernalillo County under Monell v. Department

of Social Services of City of New York. See MSJ at 25 (citing DeAnzona v. City and Cty. of Denver, 222 F.3d 1229, 1236 (10th Cir. 2000)). They assert that her vicarious liability claim in Count V also fails if the Court concludes that the individual defendants are entitled to qualified immunity. See MSJ at 25 (citing Quintana v. Santa Fe Bd. of Comm'rs, No. CIV 18-0043 JB\LF, 2019 WL 452755, *64 (D.N.M. Feb. 5, 2019)(Browning, J.)).

Finally, the County Defendants argue that the Court should dismiss Count IV if it concludes that the County Defendants are entitled to qualified immunity for Count I and II. See MSJ at 25-27. They state that O'Farrell's Count IV alleges a violation of § 1983 as a result of a New Mexico Tort Claims Act violation. See MSJ at 26. They further assert that, "other than the title for Count IV, Plaintiff has not pleaded a federal claim," and Count IV is redundant with other claims in Count I and II. MSJ at 27. They argue that a state tort claim is still subject to qualified immunity. See MSJ at 27.

### 2.    The Response.

O'Farrell responds to the MSJ, but she does not address the County Defendants' arguments concerning deliberate indifference to her medical needs. See Plaintiff's Fed. R. Civ. P. 56(d) Response to Defendants' Motion for Summary Judgment on Qualified Immunity: Dismissal of Counts I-V of Plaintiff's Complaint, filed March 29, 2019 (Doc. 51)("Response"). O'Farrell first addresses her contention that Day violated clearly established rights. See Response at 16. She argues that "it is clearly established that a law enforcement officer may not use force on a compliant suspect already under the officer's control and not resisting detention or trying to flee." Response at 17 (citing Olsen v. Layton Hills Mall, 312 F.3d 1304, 1314-15 (10th Cir. 2002); Dixon v. Richer, 922 F.2d 1456, 162-63 (10th Cir. 1991); Baker v. City of Hamilton, 471 F.3d 601, 607 (6th Cir. 2006)). She asserts that it also is clearly established that "the use of a Taser upon an

individual who has not placed anyone's safety in imminent danger is a violation of the Fourth Amendment."  Response at 18 (citing Casey v. City of Fed. Heights, 509 F.3d 1278, 1286 (10th Cir. 2007); Wate v. Kubler, 839 F.3d 1012, 1021 (11th Cir. 2016); Oliver v. Florino, 586 F.3d 898, 902, 906-08 (11th Cir. 2009); Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004)). O'Farrell argues that the facts, when viewed in a light most favorable to her, show that Day shoved her naked and defenseless against a wall and then Tasered her in the back without warning.  See Response at 19.  The facts, she says, also show that Day again Tasered her without warning a minute later and then Tasered her again when O'Farrell, against orders, reached for her sports bra that was nowhere near the officers.  See Response at 19-20.  O'Farrell contends that the facts also show Day shot the Taser at her "while Plaintiff had her palms outstretched, pleading for Defendant Day to stop."  Response at 20.  These actions, O'Farrell argues, were "a clear violation of the Fourth Amendment."  Response at 20.

O'Farrell also argues that Garcia violated her clearly established rights by failing to intervene to prevent Day's conduct.  See Response at 20.  She contends that it is clearly established that officers have a duty to intervene to prevent unconstitutional uses of force.  See Response at 20-21 (citing Fogerty v. Gallegos, 523 F.3d 1147, 1162-63 (10th Cir. 2008); Mick v. Brewer, 76 F.3d 1127, 1136 (10th Cir. 1996); Lusby v. T.G. & Y. Stores, Inc., 749 F.2d 1423, 1433 (10th Cir. 1984); Vondrak v. City of Las Cruces, 535 F.3d 1198, 1210 (10th Cir. 2008)).  O'Farrell contends that Garcia is not entitled to qualified immunity, because a jury could reasonably find that she had the opportunity and failed to intervene after Day shoved O'Farrell into the wall, Tasered her without warning, and retased her when O'Farrell "posed no risk to herself or to others."  Response at 21.

O'Farrell also argues that she states a viable claim under Monell v. Department of Social Services of the City of New York.  See Response at 21.  She states that the parties are "coordinating regarding the production of 20,000 additional documents related to complaints, grievances, investigations or reports related to the use of Tasers and/or the administration of strip searches at the Bernalillo County Metropolitan Detention Center within the five years preceding the Complaint to present."  Response at 22.   She also asserts that her review of "complaints, grievances, investigations or reports" related to Taser-use and strip searches at MDC "has yielded information establishing a pattern and practice at the MDC of the unconstitutional use of force and/or Taser."  Response at 22.  She concludes that she expects the remaining documents will establish a pattern and practice of unconstitutional use of force, and, "[a]s such, Plaintiff has stated a viable *Monell* claim and Defendants are not entitled to judgment as a matter of law."  Response at 22.

O'Farrell then argues that she has alleged viable claims under the New Mexico Tort Claims Act.  See Response at 23.  She says that immunity is waived for assault and battery, see Response at 23 (citing N.M. Stat. Ann. § 41-4-12), and that, to allege a claim for battery, she "'need only allege that the officers failed to exercise the care of reasonably prudent and qualified officers in an activity undertaken for the safety of others,'"  Response at 23 (quoting Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't, 1998-NMSC-021, ¶ 23, 916 P.2d 1313, 1320).  O'Farrell argues that Day used unnecessary force in shoving her against the wall and in repeatedly using a Taser on her.  See Response at 23-24.  She also argues that "New Mexico law only affords law enforcement officials privileges against recklessness, negligence, and gross negligence claims so long as they use only that force that is reasonably necessary," Response at 24 (citing Alaniz v. Funk, 1961-NMSC-140, ¶ 7, 364 P.2d 1033, 1034), and that plaintiffs can bring claims under the New Mexico

Tort Claims Act when officers do not implement use of force policies, see Response at 25 (citing Weinstein v. City of Santa Fe ex. rel Santa Fe Police Dep't, 1996-NMSC-021 ¶¶ 32-33, 42, 916 P.2d at 1321-23).  Accordingly, O'Farrell argues that the County Defendants are not entitled to summary judgment on her recklessness, gross negligence, or negligence claims.  See Response at 25.

### 3.      **The Reply**.

The County Defendants filed a Reply and argue first that O'Farrell "offers no legal analysis regarding why claims under the Fourth Amendment would generate liability under the Fourteenth Amendment."  Reply at 6.  They assert that the Supreme Court of the United States has "explicitly held the analysis under the Fourteenth Amendment, while based upon the same objective reasonableness standard used in Fourth Amendment, requires a consideration of the unique nature of a detention facility."   Reply at 7 (citing Kingsley v. Hendrickson, 576 U.S. 389 (2015) ("Kingsley")).   The County Defendants argue that, if O'Farrell has cited cases applicable to Fourteenth Amendment claims, her deposition testimony is inconsistent, and the facts show that Day's force is objectively justified.  See Reply at 8.  The County Defendants then reiterate their argument that Day did not violate clearly established law, arguing that O'Farrell's cases do not involve a Fourteenth Amendment claim and that she was neither non-threatening nor compliant. See Reply at 8-9.  On O'Farrell's Monell v. Department of Social Services of the City of New York claim, the County Defendants state that they "did not attack the factual basis for Plaintiff's claims" but "have simply asserted that absent liability for the underlying conduct, there can be no Monell claim."  Reply at 9.  They note that O'Farrell offers no authority contrary to this point.  See Reply at 9.

Finally, the County Defendants contend that O'Farrell does not allege an assault or battery claim in the Complaint, which only alleges liability under the New Mexico Tort Claims Act based on § 1983 violations.  See Reply at 10.  They argue that O'Farrell "should not be allowed to create a moving target by changing her legal theories and claims from those set forth in her Complaint." Reply at 10.  The County Defendants also assert that, for cases interpreting law enforcement liability under the New Mexico Tort Claims act, "any negligence must result in the commission of an enumerated and intentional tort."  Reply at 10 (citing Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't, 1998-NMSC-021, ¶ 21, 916 P.2d at 1319; Lessen v. City of Albuquerque, 2008-NMCA-085, ¶ 38, 187 P.3d 179, 186; Dickson v. City of Clovis, 2010-NMCA-058, ¶ 20, 242 P.3d 398, 403-04; Soliz v. N.M. Dep't of Pub. Safety, No. Civ. 15-0123 KBM/LF, 2015 WL 13286784, at *4 (D.N.M. Oct. 29, 2015)(Molzen, C.M.J.)).  The County Defendants conclude by stating that O'Farrell's argument that Day "can be held liable for her negligence in failing to enact policies that caused her own excessive use of force" is "bizarre and unsupported."  Reply at 11.

4.     **The Hearing.**

The Court held a hearing on the MSJ on May 8, 2019.  See Clerk's Minutes at 1.  The County Defendants first noted that they had spoken with O'Farrell and that she does not object to dismissal of her medical deliberate indifference claims.  See Tr. at 3:2-9 (Rahn).  The County Defendants then told the Court that they are arguing both prongs of the qualified immunity analysis and not just the clearly established prong.  See Tr. at 5:13-20 (Court, Rahn).  After discussing the MSJ's unorthodox factual organization, see Tr. at 6:6-9:3 (Court, Rahn), the County Defendants argued that they believed "that in the argument section of our motion there is a couple of kind of glar[ing] issues with" O'Farrell's legal argument, Tr. at 9:4-6 (Rahn).

The County Defendants first argued that O'Farrell does not cite any Fourteenth

Amendment case establishing a constitutional violation.  See Tr. at 9:6-9 (Rahn).  They argue that, while O'Farrell has cited Fourth Amendment cases, "simply citing Fourth Amendment case law and trying to [] apply the Graham [v. Connor, 490 U.S. 386, 396 (1989)("Graham"),] objective reasonableness [test] to do a [Fourteenth] Amendment claim is not viable under a basic reading of Kingsley v. Hendrickson."  Tr. at 10:9-12 (Rahn).  The County Defendants argued that O'Farrell "simply said well this is objectively reasonably under Graham, therefore it's objectively reasonable under Kingsley, but there is that factual analysis that must occur and the factual analysis is just simply different in a detention facility."  Tr. at 12:2-7 (Rahn).  The two cases, the County Defendants noted, provide different factors for courts to analyze the objective reasonableness of a defendant's actions.  See Tr. at 12:8-12 (Rahn); id. at 13:6-9 (Rahn).

The Court then asked the County Defendants to argue whether O'Farrell's complaint and deposition state a constitutional violation.  See Tr. at 13:25-14:3 (Court); id. at 14:12-17 (Court). The County Defendants argued that O'Farrell admitted that she was noncompliant, which would justify using a Taser.  See Tr. at 14:18-15:2 (Rahn).  The Court expressed skepticism that noncompliance, without anything else, justifies Taser use as a matter of law.  See Tr. at 15:8-16:5 (Court, Rahn); id. at 16:24-17:7 (Court).  The County Defendants argued that the Taser use was not punitive, but was intended to enforce compliance.  See Tr. at 17:8-12 (Rahn).  They conceded that reasonableness "still depends on the facts and circumstances of the situation," Tr. at 17:17-18 (Rahn), but argued that this was a situation where MDC had to "clear these individuals" and "accomplish a search," Tr. at 17:21-22 (Rahn).  The Court said that these facts still seemed to implicate the lower end of prison disobedience.  See Tr. at 18:2-10 (Court).  The County Defendants responded that Day did not know what O'Farrell was attempting to hide and said that the "strip search is [] an important task that jail detention officers have to accomplish," in part

because O'Farrell could have hurt herself.  Tr. at 19:8-9 (Rahn).  <u>See</u> <u>id.</u> at 19:2-14 (Rahn).  The County Defendants justified Day's second Taser use as within the same timeframe as the first Taser use and during a struggle to stop O'Farrell from further pushing an object into her vagina. <u>See</u> Tr. at 19:14-20 (Rahn).

Regarding Day's third Taser use, the County Defendants argue that, even under O'Farrell's version of events, she is not following orders and is reaching away from Day.  <u>See</u> Tr. at 20:4-7 (Rahn).  For the fourth Taser use, the County Defendants state that O'Farrell is unable to dispute that she was struggling and could not control her legs, and therefore use of force was justified under the reasonable officer standard.  <u>See</u> Tr. at 20:16-25 (Rahn).  The County Defendants then argued that O'Farrell was inconsistent throughout her deposition, and that it "would be unfair for the plaintiff to pick and choose" which version of her story to cite.  <u>See</u> Tr. at 21:10-22:4 (Rahn).

The County Defendants then addressed qualified immunity's clearly established prong. <u>See</u> Tr. at 22:11 (Rahn).  They argued that caselaw and Supreme Court precedent do not support a court's ability "to make the leap that anytime a police officer can or [] cannot use force it's clearly established a detention officer can or cannot use force."  Tr. at 22:21-24 (Rahn).  After the Court noted that the Supreme Court "is almost alone" in its clearly established doctrine, the County Defendants stated that "until a change happens what we have before us is very clear case law from the United States Supreme Court that clearly established cannot be satisfied by general propositions."  Tr. at 24:4-8 (Rahn).

Next, the County Defendants briefly discussed O'Farrell's municipal liability claim and argued that the Court should dismiss it, if it finds no underlying liability against Day.  <u>See</u> Tr. at 25:10-20 (Rahn).  Regarding O'Farrell's tort claims, they argued that her assault and battery claim is not in the Complaint and that the Court should not address them.  <u>See</u> Tr. at 26:11-13 (Rahn).

The County Defendants concluded by stating their position that the Court would continue to have jurisdiction over O'Farrell's state law claims if it dismissed her federal claims.  See Tr. at 26:14-27:6 (Rahn).

O'Farrell then presented her response.  See Tr. at 27:11-12 (Green).  Asked whether the Court should use her statement of additional facts to clarify the County Defendants' MSJ, O'Farrell said: "Well, it's actually all contained in our [responses]."  Tr. at 28:24-25 (Green).  She stated that her response to MSJ ¶ 15 "sets forth the course of events based upon knowledge of Ms. O'Farrell's testimony during her deposition, [and] also the physical evidence in this case."  Tr. at 29:3-6 (Green).

O'Farrell then argued that Day violated the Constitution of the United States of America each time she used the Taser.  See Tr. at 29: 14-18 (Green).  O'Farrell then presented the facts surrounding Day's first Taser use.  See Tr. at 30:1-32:19 (Green).  She argued that "[w]hat's clear from the sequence of events is that Ms. O'Farrell was not physically confrontational at any point."  Tr. at 32:20-22 (Green).  She argued that the cases that she cited set forth "the general principle" that "a Taser cannot be used against a pretrial detainee who poses no threat to themselves or to someone else."  Tr. at 33:24-34:3 (Green).  As an "aside," O'Farrell noted that, in the deposition she said that she did not struggle against Day.  Tr. at 34:14 (Green).

O'Farrell next cited the cases setting forth her general principle.  See Tr. at 34:22-23 (Green)(citing Lewis v. Downey, 581 F.3d 467, 479 (10th Cir. 2009); Martinez v. Stanford, 323 F.3d 1178, 1180, 1183 (9th Cir. 2003); Hickey v. Reeder, 12 F.3d 754, 759 (8th Cir. 1993)).  She then cited cases suggesting times when officers may use Tasers, and she distinguished them as instances where the plaintiff was struggling  See Tr. at 36:1-37:10 (Green)(citing Stevenson v. Cordova, 733 F. App'x at 944; Youngquist v. Bd. of Cty. Comm'rs for Curry Cty., N.M., 2016

WL 9725196).  O'Farrell then stated that Casey v. City of Federal Heights, is the Tenth Circuit case most helpful to her case, because the police officer in that case gave no warning before deploying a Taser.  See Tr. at 38:1-5 (Green).   The Court stated that there is "a major difference factually when you have a case that's on the street as opposed to in a jail or prison facility," Tr. at 38:23-25 (Green), and O'Farrell then stated that Stevenson v. Cordova is the most helpful Tenth Circuit use-of-force case in the prison context, see Tr. at 39:21-40:1 (Green).  She also stated that cases in other United States Courts of Appeals have addressed similar issues.  See Tr. at 40:1-21 (Green)(citing Hickey v. Reeder, 12 F.3d 754).  When the Court pressed again, see Tr. at 40:22-41:7 (Court), O'Farrell returned to Stevenson v. Cordova as the most helpful Tenth Circuit case, see Tr. at 41:8-11 (Green).  O'Farrell said that the most helpful Supreme Court cases for her are Kingsley v. Hendrickson, see Tr. at 42:23-43:2 (Green), and Saucier v. Katz, 533 U.S. 194 (2001), see Tr. at 43:15-44:2 (Green).  She also returned to Tenth Circuit cases and argued that, aside from the fact that they occurred between police officers and the public rather than in prison, Olsen v. Layton Hills Mall and Dixon v. Richer also help her argument.  See Tr. at 41:25-42:22 (Green).

O'Farrell agreed with the County Defendants that, if there is no underlying excessive force constitutional violation, her claim under Monell v. Department of Social Services of the City of New York then fails.  See Tr. at 44:5-8 (Green).  Regarding her tort claims, she stated that "to the extent that it was asserted that our complaint did not sufficiently flush out [the New Mexico Tort Claims Act] claims, I would note that they are set forth in our complaint in Count 4."  Tr. at 44:17-20 (Green).  She asked for leave to amend if the Court concludes that the Complaint does not put the parties on notice of her claim.  See Tr. at 44:25-45:5 (Green).  She concluded by stating her preference that, if the Court grants the MSJ, the Court also remand any remaining state claims to state court.  See Tr. at 45:10-11 (Green).

The County Defendants then again addressed the Court.  See Tr. at 45:15 (Rahn).  They noted that, at one point during her deposition, O'Farrell stated that Day used no physical force against her.  See Tr. at 45:24-46:4 (Rahn).  The County Defendants then reiterated that prison and jail security concerns are very different from those concerns that police officers face on the street, and that prison guards have "a completely different constitutional standard."  Tr. at 46:21-22 (Rahn).  They also stated that plaintiffs bear the burden of producing analogous cases and that defendants do not need to show anything for qualified immunity's clearly established prong.  See Tr. at 47:3-10 (Rahn).  The County Defendants next stated that Graham v. Connor is not considered relevant in the qualified immunity analysis.  See Tr. at 47:17-48:2 (Rahn).  Finally, they argued that they would suffer prejudice if O'Farrell were allowed to amend the Complaint, because the parties have conducted extensive discovery, the incident occurred in 2017, and they have already fully briefed this MSJ.  See Tr. at 48:2-17 (Rahn).

O'Farrell responded briefly, and argued that MDC's policies and practices regarding Taser use "fit in well" with the Kingsley v. Hendrickson analysis.  Tr. at 49:8 (Green).  The Court noted that, under Tenth Circuit precedent, an organization's policies and practices "don't help much."  Tr. at 49:19 (Court).  The Court also noted that Bernalillo County does not have a policy of using Tasers before other means.  See Tr. at 50:10-13 (Court).  O'Farrell noted that she was "certainly happy to amend if the Court allows it once we obtain discovery."  Tr. at 51: 13-14 (Green).

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's

case.'"  <u>Herrera v. Santa Fe Pub. Sch.</u>, 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning,

J.)(alteration in <u>Herrera v. Santa Fe Pub. Sch.</u>)(quoting <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>,

939 F.2d 887, 891 (10th Cir. 1991)).  <u>See</u> <u>Celotex Corp. v, Catrett</u>, 477 U.S. 317, 323 (1986).

> Before the court can rule on a party's motion for summary judgment, the moving
> party must satisfy its burden of production in one of two ways: by putting evidence
> into the record that affirmatively disproves an element of the nonmoving party's
> case, <u>or by directing the court's attention to the fact that the non-moving party lacks</u>
> <u>evidence on an element of its claim, "since a complete failure of proof concerning</u>
> <u>an essential element of the nonmoving party's case necessarily renders all other</u>
> <u>facts immaterial.</u>"  <i>Celotex</i>, 477 U.S. at 323-25.  On those issues for which it bears
> the burden of proof at trial, the nonmovant "must go beyond the pleadings and
> designate specific facts to make a showing sufficient to establish the existence of
> an element essential to his case in order to survive summary judgment."  <i>Cardoso</i>
> <i>v. Calbone</i>, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets
> omitted).

<u>Plustwik v. Voss of Nor. ASA</u>, No. 2:11CV00757 DS, 2013 WL 1945082, at *1 (D. Utah May 9,

2013)(Sam, J.)(emphasis added).  "If the <i>moving</i> party will bear the burden of persuasion at trial,

that party must support its motion with credible evidence -- using any of the materials specified in

Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  <u>Celotex Corp.</u>

<u>v. Catrett</u>, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[24]  Once the movant

meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that

there is a genuine issue for trial.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. at 324; <u>Anderson v. Liberty</u>

<u>Lobby</u>, 477 U.S. 242, 256 (1986)("<u>Liberty Lobby</u>").  In <u>American Mechanical Sols., LLC v.</u>

<u>Northland Piping, Inc.</u>, 184 F. Supp. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted

---

[24]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme
Court, dissented in <u>Celotex Corp. v. Catrett</u>, this sentence is widely understood to be an accurate
statement of the law.  <u>See</u> 10A Charles Allen Wright & Arthur R. Miller, <u>Federal Practice and</u>
<u>Procedure</u> § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the
majority and dissent both agreed as to how the summary-judgment burden of proof operates; they
disagreed as to how the standard was applied to the facts of the case.").

summary judgment for the defendant when the plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims. See 184 F. Supp. 3d at 1075-78. The Court reasoned that the plaintiff could prove neither the breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-merchantability claim's proximate-causation requirement with mere common knowledge, and so New Mexico law required that the plaintiff bolster its arguments with expert testimony, which the plaintiff had not provided. See 184 F. Supp. 3d at 1067, 1073, 1075, 1079. Without the requisite evidence, the plaintiff, the Court determined, failed to prove "an essential element of the nonmoving party's case," rendering "all other facts immaterial." 184 F. Supp. 3d at 1075 (internal quotation marks omitted)(quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1). Thus, if a plaintiff has the burden of proof, and the plaintiff has no competent evidence, the defendant may move, without any competent evidence itself, past the plaintiff's lack of competent evidence and secure summary judgment. See, e.g., Celotex Corp. v. Catrett, 477 U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an essential element of its case); Am. Mech. Solutions, LLC v. Northland Piping, Inc., 184 F. Supp. 3d at 1075 (granting summary judgment because plaintiff lacked evidence on causation); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that defendants defectively manufactured an oil distributor). A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence. See Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim). See also 11 James Wm. Moore et al., Moore's Federal Practice

§ 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 259. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (citation and internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)). "In

responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill")); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." Liberty Lobby, 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Liberty Lobby, 477 U.S. at 249. Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind

the actual quantum and quality of proof necessary to support liability."  Liberty Lobby, 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citation omitted)).  Fourth, the court cannot decide any issues of credibility.  See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment is appropriate where video evidence quite clearly contradicted the plaintiff's version of the facts.  See 550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. [at] 586-587 . . . (footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. [at] 247-248 . . . .  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.
>
> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir.

2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation,
> a plaintiff's version of the facts must find support in the record: more specifically,
> "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two
> different stories, one of which is blatantly contradicted by the record, so that no
> reasonable jury could believe it, a court should not adopt that version of the
> facts[.]'" *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting
> *Scott*, 550 U.S. at 380); *see also Estate of Larsen ex rel. Sturdivan v. Murr*, 511
> F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake Cty.,

third and fourth alterations in York v. City of Las Cruces).  "The Tenth Circuit, in *Rhoads v. Miller*,

[352 F. App'x 289 (10th Cir. 2009)(unpublished),] explained that the blatant contradictions of the

record must be supported by more than other witnesses' testimony[.]"  Lymon v. Aramark Corp.,

728 F. Supp. 2d at 1249.

### LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise

their discretion and the related public interest in encouraging the vigorous exercise of official

authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects federal

and state officials from liability for discretionary functions, and from 'the unwarranted demands

customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of

Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. April 28,

2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  Under § 1983, a

plaintiff may seek money damages from government officials who have violated his or her

constitutional or statutory rights.  To ensure, however, that fear of liability will not "unduly inhibit

officials in the discharge of their duties," <u>Anderson v. Creighton</u>, 483 U.S. 635, 638 (1987), the

officials may claim qualified immunity; so long as they have not violated a "clearly established"

right, the officials are shielded from personal liability, <u>Harlow v. Fitzgerald</u>, 457 U.S. at 818.

> That means a court can often avoid ruling on the plaintiff's claim that a particular
> right exists. If prior case law has not clearly settled the right, and so given officials
> fair notice of it, the court can simply dismiss the claim for money damages. The
> court need never decide whether the plaintiff's claim, even though novel or
> otherwise unsettled, in fact has merit.

<u>Camreta v. Greene</u>, 563 U.S. 692, 705 (2011).

Qualified immunity shields government officials from liability where "'their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person would

have known.'" <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009)(quoting <u>Harlow v. Fitzgerald</u>, 457

U.S. at 818).   Qualified immunity also shields officers who have "reasonable, but mistaken

beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law.  <u>Saucier</u>

<u>v. Katz</u>, 533 U.S. at 205.   When a defendant asserts qualified immunity, the plaintiff must

demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights;

and (ii) that the right was clearly established at the time of the alleged misconduct.  <u>See</u> <u>Riggins v.</u>

<u>Goodman</u>, 572 F.3d 1101, 1107 (10th Cir. 2009); <u>Pueblo of Pojoaque v. New Mexico</u>, 214 F. Supp.

3d 1028, 1079 (D.N.M. 2016)(Browning, J.).

## 1.   Procedural Approach to Qualified Immunity.

The Supreme Court has provided the proper procedure for lower courts to evaluate a

qualified immunity defense.  In <u>Pearson v. Callahan</u>, the Supreme Court held that lower courts

"should be permitted to exercise their sound discretion in deciding which of the two prongs of the

qualified immunity analysis should be addressed first in light of the circumstances of the particular

case at hand."  555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory,

<u>Saucier v. Katz</u>' protocol -- by which a court first decides if the defendant's actions violated the Constitution and then determines if the right violated was clearly established -- will often be beneficial.  <u>See Pearson v. Callahan</u>, 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognizes that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district courts and Courts of Appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognizes that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable." 555 U.S. at 241 (alterations omitted).  <u>See Reichle v. Howards</u>, 566 U.S. 658, 664 (2012)(affirming <u>Pearson v. Callahan</u>'s procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior caselaw "comports with our usual reluctance to decide constitutional questions unnecessarily").

The Supreme Court recognizes seven circumstances where district courts "should address only"[25] the clearly established prong of the qualified immunity analysis: when (i) the first,

---

[25]In <u>Camreta v. Greene</u>, the Supreme Court, somewhat confusingly, states that there are seven circumstances in which the district courts "should address only" the clearly established prong, but, in the same sentence, notes that deciding the violation prong is left "to the discretion of the lower courts." <u>Camreta v. Greene</u>, 563 U.S. at 707.  In <u>Kerns v. Bader</u>, 663 F.3d 1173 (10th Cir. 2011), the Tenth Circuit interpreted <u>Camreta v. Greene</u> to mean that district courts are restricted from considering the violation prong in seven particular circumstances.  <u>See Kerns v. Bader</u>, 663 F.3d at 1180-81.  The Supreme Court, however, has not stressed the seven circumstances as mandatory.  Instead, it has recently reaffirmed only that lower courts "should think hard, and then think hard again before addressing both qualified immunity and the merits of an underlying constitutional claim."  <u>District of Columbia v. Wesby</u>, 138 S. Ct. 577, 589 n.7 (2018).  This language suggests that the inquiry is still discretionary, although the Court's discretion should be exercised carefully.

constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced that the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "'it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right.'" Kerns v. Bader, 663 F.3d at 1180-81 (quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely to face challenges only in the qualified immunity context. Camreta v. Greene, 563 U.S. at 706-07. See Kerns v. Bader, 663 F.3d at 1181.[26] "Courts

---

[26]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer. 663 F.3d at 1183. In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.  See Sanchez v. Labate, 564 F. App'x 371, 372 (10th Cir. 2014)("If dispositive of the claim, we ordinarily need address only the second element of qualified immunity, that is, whether the law supporting a constitutional violation was clearly established." (citing Kerns v. Bader, 663 F.3d at 1180)).  The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)." 663 F.3d at 1187 n.5.

The Tenth Circuit does not always undertake the "clearly established" analysis before the constitutional violation analysis.  See, e.g., Savage v. Troutt, 774 F. App'x 574, 579 (10th Cir. 2019); Rudnick v. Raemisch, 774 F. App'x 446, 449 (10th Cir. 2019); Serrano v. United States, 766 F. App'x at 565.  Since Kerns v. Bader, the Tenth Circuit has commented:

> Although it is within the court's sound discretion to determine which of the two elements to address first, Pearson, 555 U.S. at 236 . . . , "the Supreme Court has recently instructed that courts should proceed directly to, 'should address only,' and should deny relief exclusively based on the second element" in certain circumstances, Kerns, 663 F.3d at 1180 (quoting Camreta v. Greene, 563 U.S. [at] 707 . . . .)).

Serrano v. United States, 766 F. App'x at 565.  In Serrano v. United States, the Tenth Circuit stated that the district court addressed only the constitutional violation prong after concluding that Serrano had not established a constitutional violation and approved the district court's analysis, because the district court "also had to consider the reasonableness of the team's use of force for purposes of Serrano's [Federal Tort Claim Act, 28 U.S.C. §§ 1291, 1346, 1402, 2401-02, 2411-12, 2671-60,] claims."  Serrano v. United States, 766 F. App'x at 565.

The Court believes, as a general rule, that the constitutional violation analysis should receive more attention.  On remand from Kerns v. Bader, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by [the Tenth Circuit's] statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.  A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:
>
>> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment."  The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

407 U.S. at 238-39. Congress did not say it would remedy only violations of "clearly established" law, but that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983. The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional. See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010). The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." Wood v. Strickland, 420 U.S. 308, 322 (1975). In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test. See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights."). It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011). Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral

should think carefully before expending 'scarce judicial resources' to resolve difficult and novel

questions of constitutional or statutory interpretation that will 'have no effect on the outcome of

the case.'" Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S.

---

theory suggests that the exclusionary rule is not very effective in scaring police into behaving . . . .  These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at 596-97.  Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized by Ysasi v. Brown, 3 F. Supp. 3d 1088, 1130-31 n.24 (D.N.M. 2014)(Browning, J.).  See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).  Since Kerns v. Board of Commissioners, the Court has also observed:

> The unfortunate result of Kerns v. Bader is that nuanced factual distinctions can create a near-insurmountable hurdle for plaintiffs attempting to overcome a qualified immunity defense without a precisely analogous precedent.

> A secondary consequence of Kerns v. Bader is that constitutional protections are unlikely to develop in the Tenth Circuit beyond where they stood at the time the case was decided.

A.M. ex rel. Youngers v. N.M. Dep't of Health, 108 F. Supp. 3d 963, 1029 (D.N.M. 2015)(Browning, J.).

at 236-37).[27]  See Camreta v. Greene, 563 U.S. at 707.  The Tenth Circuit will remand a case to

the district court for further consideration when the district court has given only cursory treatment

to qualified immunity's clearly established prong.  See Kerns v. Bader, 663 F.3d at 1182; Pueblo

of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1082-83.

> **2.     Clearly Established Rights.**

To determine whether a right was clearly established, a court must consider whether the

right was sufficiently clear that a reasonable government employee would understand that what he

or she did violated a right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327

(10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly

developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and

'unquestioned.'"   Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir.

2011)(unpublished)[28](quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

---

[27]The appellate courts have little appreciation for how hard it is to do a clearly established prong review first without looking -- closely and thoroughly -- at whether there is a constitutional right and whether there is a violation.  It is difficult to review the facts, rights, and alleged violations in the comparative cases without looking at the facts, rights, and alleged violations on the merits in the case before the Court.  Pearson v. Callahan sounds like a good idea in theory, but it does not work well in practice.  The clearly established prong is a comparison between the case before the Court and previous cases, and Pearson v. Callahan suggests that the Court can compare before the Court fully understands what it is comparing.  In practice, Saucier v. Katz works better.

[28]Lobozzo v. Colorado Department of Correction, is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value").  The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored.... However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin. 426 F.3d 1266, 1274 (10th Cir.2005).  The Court concludes that Lobozzo v. Colorado Department of Correction, Serrano v. United States, 776 F. App'x 561 (10th Cir. 2019); Rudnick v. Raemisch, 774 F. App'x 446 (10th Cir. 2019); Savage v. Troutt, 774 F. App'x 574 (10th Cir. 2019);  Choate v. Huff, 773 F. App'x 484, (10th Cir. 2019); Rife v. Jefferson, 742 F. App'x 377

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d at 923.  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).  The Supreme Court has clarified that qualified immunity's clearly established prong is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. at 741.  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  Reichle v. Howards, 566 U.S. at 664 (quoting Ashcroft v. al-Kidd, 563 U.S. at 741).  "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"  Mullenix v. Luna, 136 S. Ct. 305, 308 (2015)(quoting Malley v. Briggs, 475 U.S. at 341).

 "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified."  Anderson v. Creighton, 483 U.S. at 639.  The

---

(10th Cir. 2018); Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x 552 (10th Cir. 2017); Brown v. City of Colo. Springs, 709 F. App'x 906 (10th Cir. 2017); Sanchez v. Labate, 564 F. App'x 371 (10th Cir. 2014); Wilson v. City of Lafayette, 510 F. App'x 775 (10th Cir. 2013); and Stevenson v. Cordova, 733 F. App'x 939 (10th Cir. 2018), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

Supreme Court has stated: "[T]he clearly established right must be defined with specificity." City of Escondido v. Emmons, 139 S. Ct. 500, 503 (2019).  "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 563 U.S. at 742.  "[T]the clearly established law must[, rather,] be 'particularized' to the facts of the case," White v. Pauly, 137 S. Ct. 548, 552 (2017)(quoting Anderson v. Creighton, 483 U.S. at 640); under this view of the clearly established prong, a court should inquire whether clearly established law makes improper the actions that the officer took in the case's circumstances, see City of Escondido v. Emmons, 139 S. Ct. at 503 (directing the Court of Appeals to ask, in excessive force cases, "whether clearly established law prohibited the officers from stopping and taking down a man in these circumstances").  See Ziglar v. Abbasi, 137 S. Ct. 1843, 1866 (2017)("[T]he dispositive question is 'whether the violative nature of particular conduct is clearly established.'" (quoting Mullenix v. Luna, 136 S. Ct. at 308)); District of Columbia v. Wesby, 138 S. Ct. 577, 591 (2018)("Tellingly, neither the panel majority nor the partygoers have identified a single precedent -- much less a controlling case or robust consensus of cases -- finding a Fourth Amendment violation under similar circumstances.").

The Tenth Circuit has, however, emphasized the Supreme Court's statements that, in some situations, "clearly established general rules of law can provide notice of the unlawfulness of an official's conduct in appropriate circumstances."  A.N. by & through Ponder v. Syling, 928 F.3d 1191, 1198 (10th Cir. 2019).  The Tenth Circuit has commented: "'[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers' that their conduct violates a constitutional right, and that such statements provide the required notice when 'the unlawfulness' of their conduct is 'apparent' from the pre-existing law."  A.N. by & through Ponder v. Syling,

928 F.3d at 1198 (quoting White v. Pauly, 137 S. Ct. at 552).  According to the Tenth Circuit, "'[g]eneral statements of the law can clearly establish a right for qualified immunity purposes if they apply with obvious clarity to the specific conduct in question.'  And this is so 'even though the very action in question has not previously been held unlawful.'"  A.N. by & through Ponder v. Syling, 928 F.3d at 1198 (first quoting Halley v. Huckaby, 902 F.3d 1136, 1149 (10th Cir. 2018), and then quoting Hope v. Pelzer, 536 U.S. 730 (2002)).  The Tenth Circuit has cautioned that such an approach is inappropriate where a case involves "relevant ambiguities."  Colbruno v. Kessler, 928 F.3d 1155, 1165 (10th Cir. 2019)(citing Aldaba v. Pickens, 844 F.3d 870, 879 (10th Cir. 2016)("Aldaba II"); Wilson v. City of Lafayette, 510 F. App'x 775, 778 (10th Cir. 2013); Thomson v. Salt Lake Cty., 584 F.3d at 1315-17).

Although the Tenth Circuit has recognized a sliding scale for qualified immunity's clearly established inquiry, see Casey v. City of Fed. Heights, 509 F.3d at 1284 ("We have therefore adopted a sliding scale to determine when law is clearly established."), the Tenth Circuit may have since walked back its holding that a sliding-scale is the appropriate analysis, see Aldaba v. Pickens, 844 F.3d at 876.  In Aldaba II, the Tenth Circuit reconsidered its ruling from Aldaba v. Pickens, 777 F.3d 1148 (10th Cir. 2015)("Aldaba I"), that officers were entitled to qualified immunity after the Supreme Court vacated its decision in light of Mullenix v. Luna.  In concluding that it had previously erred in Aldaba I, the Tenth Circuit determined:

> We erred . . .  by relying on excessive-force cases markedly different from this one.  Although we cited Graham v. Connor, 490 U.S. 386 (1989) to lead off our clearly-established-law discussion, we did not just repeat its general rule and conclude that the officers' conduct had violated it.  Instead, we turned to our circuit's sliding-scale approach measuring degrees of egregiousness in affirming the denial of qualified immunity.  We also relied on several cases resolving excessive-force claims.  But none of those cases remotely involved a situation as here.

Aldaba II, 844 F.3d at 876.  The Tenth Circuit further noted that its sliding-scale approach may

have fallen out of favor, because the sliding-scale test relies, in part, on Hope v. Pelzer, 536 U.S.

at 739-41, and the Supreme Court's most recent qualified immunity decisions do not invoke that

case.  See Aldaba II, 844 F.3d at 874 n.1.  See also Lowe v. Raemisch, 864 F.3d 1205, 1211 n.10

(10th Cir. 2017).  The Tenth Circuit explained:

> To show clearly established law, the Hope Court did not require earlier cases with
> "fundamentally similar" facts, noting that "officials can still be on notice that their
> conduct violates established law even in novel factual circumstances."  *Id.* at 741
> . . . .  This calls to mind our sliding-scale approach measuring the egregiousness of
> conduct.  *See Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012).  But the
> Supreme Court has vacated our opinion here and remanded for us to reconsider our
> opinion in view of *Mullenix*, which reversed the [United States Court of Appeals
> for the] Fifth Circuit after finding that the cases it relied on were "simply too
> factually distinct to speak clearly to the specific circumstances here."  136 S. Ct.
> at 312.  We also note that the majority opinion in *Mullenix* does not cite *Hope v.
> Pelzer* . . . .  As can happen over time, the Supreme Court might be emphasizing
> different portions of its earlier decisions.

Aldaba II, 844 F.3d at 874 n.1.  Since Aldaba II, the Supreme Court has reversed, per curiam,

another Tenth Circuit qualified immunity decision.  See White v. Pauly, 137 S. Ct. at 551.  In

White v. Pauly, the Supreme Court explained: "The panel majority misunderstood the 'clearly

established' analysis: It failed to identify a case where an officer acting under similar

circumstances as Officer White was held to have violated the Fourth Amendment."  White v.

Pauly, 137 S. Ct. at 552.[29]  The Supreme Court's per curiam reversals appear to have the Tenth

---

[29]The Supreme Court has signaled to the lower courts that a factually identical or a highly
similar factual case is required for the law to be clearly established.  Factually identical or highly
similar factual cases are not, however, the way the real world works.  Cases differ.  Many cases
have so many facts that are unlikely to ever occur again in a significantly similar way.  See York
v. City of Las Cruces, 523 F.3d 1205, 1212 (10th Cir. 2008)("However, [the clearly established
prong] does not mean that there must be a published case involving identical facts; otherwise we
would be required to find qualified immunity wherever we have a new fact pattern.").  The
Supreme Court's view of the clearly established prong assumes that officers are well-versed in
Supreme Court and Tenth Circuit opinions.  It is hard enough for the federal judiciary to embark
on such an exercise, let alone likely that police officers are endeavoring to parse opinions.  It is far
more likely that, in their training and continuing education, police officers are taught general

principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case.  It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?"  Thus, when the Supreme Court grounds its clearly established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 138 S. Ct. at 1153, yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 138 S. Ct. at 1162 (Sotomayor, J. dissenting).  The Court concludes that the Supreme Court is doing the latter, crafting its recent qualified immunity jurisprudence to effectively eliminate § 1983 claims against state actors in their individual capacities by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong. See Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.).

The Court disagrees with the Supreme Court's approach.  The most conservative, principled decision is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the congressionally enacted § 1983 remedy.  As the Cato Institute noted in a recent amicus brief, "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based."  Brief of the Cato Institute as Amicus Curiae Supporting Petitioners at 2, White v. Pauly, 137 S. Ct. 548 (2017)(No. 17-1078)("Cato Brief").  "The text of 42 U.S.C. § 1983 . . . makes no mention of immunity, and the common law of 1871 did not include any across-the-board defense for all public officials."  Cato Brief at 2. "With limited exceptions, the baseline assumption at the founding and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct.  Judges and scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification."  Cato Brief at 2.  See generally William Baude, Is Qualified Immunity Unlawful?, 106 Cal. L. Rev. 45 (2018)(arguing that the Supreme Court's justifications for qualified immunity are incorrect).  Further, as the Honorable Clarence Thomas, Associate Justice for the Supreme Court, has argued, because the Supreme Court's qualified immunity analysis "is no longer grounded in the common-law backdrop against which Congress enacted [§ 1983], we are no longer engaged in 'interpret[ing] the intent of Congress in enacting' the Act."  Ziglar v. Abbasi, 137 S. Ct. at 1871 (Thomas, J., concurring)(quoting Malley v. Briggs, 475 U.S. at 342).  "Our qualified immunity precedents instead represent precisely the sort of 'freewheeling policy choice[s]' that we have previously disclaimed the power to make."  Ziglar v. Abbasi, 137 S. Ct. at 1871 (Thomas, J., concurring)(quoting Rehberg v. Paulk, 566 U.S. 356, 363 (2012)).  The judiciary should be true to § 1983 as Congress wrote it.

Moreover, there should be a remedy when there is a constitutional violation, and jury trials are the most democratic expression of what police action is reasonable and what action is excessive.  If the citizens of New Mexico decide that state actors used excessive force or were deliberately indifferent, the verdict should stand, not be set aside because the parties could not find an indistinguishable Tenth Circuit or Supreme Court decision.  Finally, to always decide the clearly established prong first and then to always say that the law is not clearly established could be stunting the development of constitutional law.  See Aaron L. Nielson & Christopher J. Walker,

Circuit stepping lightly around qualified immunity's clearly established prong, see, e.g., Choate v. Huff, 773 F. App'x 484, 487-88 (10th Cir. 2019); Perry v. Durborow, 892 F.3d 1116, 1123-27 (10th Cir. 2018); Rife v. Jefferson, 742 F. App'x 377, 381-88 (10th Cir. 2018); Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x 552, 555-56 (10th Cir. 2017); Brown v. City of Colo. Springs, 709 F. App'x 906, 915 (10th Cir. 2017); Aldaba II, 844 F.3d at 874, and willing to reverse district court decisions should the district court conclude that the law is clearly established, but see A.N. by & through Ponder v. Syling, 928 F.3d at 1198 (concluding that the publication of information about an arrested and detained juvenile violated clearly established equal protection law prohibiting treating the juvenile differently than similarly situated juveniles); Matthews v. Bergdorf, 889 F.3d 1136, 1149-50 (10th Cir. 2018)(holding that a child caseworker was not entitled to qualified immunity, because a caseworker would know that "child abuse and neglect allegations might give rise to constitutional liability under the special relationship exception"); McCoy v. Meyers, 887 F.3d 1034, 1052-53 (10th Cir. 2018)(concluding that there was clearly established law even though the three decisions invoked to satisfy that prong were not "factually identical to this case," because those cases "nevertheless made it clear that the use of force on effectively subdued individuals violates the Fourth Amendment").

## LAW REGARDING MONELL CLAIMS

---

The New Qualified Immunity, 89 S. Cal. L. Rev. 1, 6 (2015).  And while the Tenth Circuit -- with the exception of now-Justice Gorsuch, see Shannon M. Grammel, Justice Gorsuch on Qualified Immunity, 69 Stan. L. Rev. Online 163 (2017) -- seems to agree with the Court, see, e.g., Casey v. City of Fed. Heights, 509 F.3d at 1286, the per curiam reversals appear to have the Tenth Circuit stepping lightly around qualified immunity's clearly established prong, see Aldaba II, 844 F.3d at 874; Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x at 555-56; Brown v. City of Colo. Springs, 709 F. App'x 906, 915-16 (10th Cir. 2017), and willing to reverse district court decisions.

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law. . . .

The Supreme Court has recognized that "municipalities and other bodies of local government are 'persons' within the meaning of this statute." St. Louis v. Praprotnik, 485 U.S. 112, 121 (1988). The Supreme Court has articulated "when a decision on a single occasion may be enough to establish an unconstitutional municipal policy." St. Louis v. Praprotnik, 485 U.S. at 123 (citation omitted).

> First, a majority of the Court agreed that municipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, that is, acts which the municipality has officially sanctioned or ordered. Second, only those municipal officials who have final policymaking authority may by their actions subject the government to § 1983 liability. Third, whether a particular official has final policymaking authority is a question of state law. Fourth, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business.

St. Louis v. Praprotnik, 485 U.S. at 123 (citations and internal quotation marks omitted). The Tenth Circuit has explained that there are two elements that a plaintiff must show when "suing a county under section 1983 for the actions of one of its officers": (i) "a municipal employee committed a constitutional violation"; and (ii) "a municipal policy or custom was the moving force behind the constitutional deprivation." Myers v. Okla. Cty. Bd. of Cty. Comm'rs, 151 F.3d 1313, 1318 (10th Cir. 1998)(citing Monell, 436 U.S. at 694). See Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir. 1993)(citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986); Apodaca v. Rio Arriba Cty. Sheriff's Dep't, 905 F.2d 1445, 1447-48 (10th Cir. 1990); Watson v. City of Kan. City, 857 F.2d 690, 697 (10th Cir. 1988)). Those elements apply when the plaintiff alleges

that the acts of a final policymaker are the policy of the municipality.  See Myers v. Okla. Cty. Bd. of Cty. Comm'rs, 151 F.3d at 1319 ("The Defendants do not deny that Sheriff Sharp, as the supervising law enforcement officer, was a final policymaker with respect to the decision to enter the apartment.  Thus, there is no dispute in this case that the County, through Sheriff Sharp, was the 'moving force' behind the decision to enter the apartment.  If that decision -- the decision to enter the apartment -- resulted in a constitutional violation, the County would be liable."  (citation omitted)).

## LAW REGARDING EXCESSIVE FORCE

An excessive force claim "must . . . be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." Graham v. Connor, 490 U.S. at 394.  The Supreme Court has long held that all claims of excessive force in the context of an arrest or detention should be analyzed under the Fourth Amendment's reasonableness standard.   See Graham v. Connor, 490 U.S. at 395 ("[A]ll claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . .").  The Supreme Court recognizes that "police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. at 397.  Consequently, "the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." Saucier v. Katz, 533 U.S. at 205.  When an officer moves for qualified immunity on an excessive-force claim, "a plaintiff is required to show that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have thought the force constitutionally

permissible (violates clearly established law)."  Cortez v. McCauley, 478 F.3d 1108, 1128 (10th Cir. 2007).

1.  **Relevant Factors in Determining Whether Officers' Actions Were Objectively Reasonable.**

The Tenth Circuit has provided lists of non-exclusive factors that courts consider when determining whether force was objectively reasonable.  In Estate of Larsen v. Murr, 511 F.3d 1255 (10th Cir. 2008), the Tenth Circuit stated:

> In assessing the degree of threat facing officers, then, we consider a number of non-exclusive factors.  These include (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.

511 F.3d at 1260.  In Weigel v. Broad, 544 F.3d 1143 (10th Cir. 2008), the Tenth Circuit also provided:

> Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

544 F.3d at 1151-52 (citations omitted).  The court assesses "objective reasonableness based on whether the totality of the circumstances justified the use of force, and pays careful attention to the facts and circumstances of the particular case."  Estate of Larsen v. Murr, 511 F.3d at 1260 (internal quotation marks omitted).

2.  **Least- or Less-Forceful Alternatives in Excessive-Force Cases.**

To avoid a "Monday morning quarterback" approach, the Fourth Amendment does not require the use of the least, or even a less, forceful or intrusive alternative to effect custody, so long as the use of force is reasonable under Graham v. Connor.  The Fourth Amendment requires

only that the defendant officers chose a "reasonable" method to end the threat that the plaintiff

posed to the officers in a force situation, regardless of the availability of less intrusive alternatives.

Graham v. Connor, 490 U.S. at 397.

In Michigan Department of State Police v. Sitz, 496 U.S. 444, 450-51 (1990), the Supreme

Court examined a case addressing the constitutionality of highway sobriety checkpoints and stated

that Brown v. Texas, 443 U.S. 47 (1979),

> was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger. Experts in police science might disagree over which of several methods of apprehending drunken drivers is preferable as an ideal. But for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with government officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers.

496 U.S. at 453-54. See Illinois v. Lafayette, 462 U.S. 640, 647 (1983)("[T]he reasonableness of

any particular government activity does not necessarily turn on the existence of alternative 'less

intrusive' means."). To avoid unrealistic second guessing, the Fourth Amendment does not require

that an officer use the least-intrusive alternative available to protect himself or others so long as

the method chosen is reasonable.

In United States v. Sokolow, 490 U.S. 1 (1989), the Supreme Court examined the Terry[30]

stop of a suspected drug courier in an airport. The Supreme Court rejected Sokolow's contention

that the arresting officers were "obligated to use the least intrusive means available to dispel their

suspicions that he was smuggling narcotics." 490 U.S. at 11. Instead, the Supreme Court held:

"The reasonableness of the officer's decision to stop a suspect does not turn on the availability of

less intrusive investigatory techniques. Such a rule would unduly hamper the police's ability to

---

[30]Terry v. Ohio, 392 U.S. 1 (1968).

make swift, on-the-spot decisions . . . and require courts to indulge in unrealistic second guessing."

United States v. Sokolow, 490 U.S. at 11 (internal quotations and citations omitted).  Similarly, in

United States v. Sharpe, 470 U.S. 675, 686-87 (1985), the Supreme Court stated that

> a creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of police might have been accomplished.  But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable."

470 U.S. at 686-87 (quoting Cady v. Dombrowski, 413 U.S. 433, 447 (1973)).

In Marquez v. City of Albuquerque, 399 F.3d 1216 (10th Cir. 2005), the Tenth Circuit disagreed with the plaintiff's contention that expert testimony about when a police dog's use is objectively reasonable and about how defendant Lehocky's actions violated "well established law enforcement standards" and rejected the plaintiff's argument that district the testimony "should have been admitted since it would have been helpful to the jury in determining whether Lehocky used a reasonable amount of force."  399 F.3d at 1222.  In so holding, the Tenth Circuit explained:

> As the district court correctly noted, the Fourth Amendment "do[es] not require [police] to use the least intrusive means in the course of a detention, only reasonable ones."  United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir. 1994).  Similarly, "violations of state law and police procedure generally do not give rise to a [42 U.S.C. §] 1983 claim" for excessive force.  Romero v. Bd. of County Comm'rs, 60 F.3d 702, 705 (10th Cir. 1995); see also Wilson v. Meeks, 52 F.3d 1547, 1554 (10th Cir. 1995)(holding that "violation of a police department regulation is insufficient for liability under section 1983" for excessive force).  Both of these principles of our Fourth Amendment jurisprudence stem from the proper perspective from which to evaluate the conduct of a police officer -- that "of a reasonable officer on the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances."  Olsen [v. Layton Hills Mall], 312 F.3d 1314.  Together, they prevent the courts from engaging in "unrealistic second guessing of police officer's decisions."  [United States v.] Melendez-Garcia, 28 F.3d at 1052
>
> Here, the only issue before the jury was whether Lehocky acted as a "reasonable officer" when he ordered his police dog to apprehend Marquez.  In making this determination, the issues of whether Lehocky used the minimum

amount of force to apprehend Marquez and whether Lehocky violated some "well established police procedure" are only tangentially related. This is because even if it found Lehocky used more than the minimum amount of force necessary and violated police procedure, the jury could nonetheless find he acted reasonably. [United States v.] Melendez-Garcia, 28 F.3d at 1052; Romero [v. Bd. of Cty. Comm'rs of Cty. Lake, 60 F.3d at 705].

Marquez v. City of Albuquerque, 399 F.3d at 1222.

In United States v. Melendez-Garcia, 28 F.3d 1046 (10th Cir. 1994), the Tenth Circuit stated: "We must avoid unrealistic second guessing of police officers' decisions in this regard and thus do not require them to use the least intrusive means in the course of a detention, only a reasonable ones." 28 F.3d at 1052 (internal quotations omitted). See Medina v. Cram, 252 F.3d 1124, 1133 (10th Cir. 2001)(stating that "the reasonableness standard does not require that officers use alternative less intrusive means" (internal quotation marks omitted)(citation omitted)); Dickerson v. McClellan, 101 F.3d 1151, 1160 (6th Cir. 1996)("[T]he Fourth Amendment does not require officers to use the best technique available as long as their method is reasonable under the circumstances."); Schulz v. Long, 44 F.3d 643, 649 (8th Cir. 1995)("[T]he Fourth Amendment inquiry focuses not on what the most prudent course of action may have been or whether there were other alternatives available, but instead whether the seizure actually effectuated falls within the range of conduct which is objectively 'reasonable' under the Fourth Amendment."); Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994)("Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment . . . .  Officers thus need not avail themselves of the least intrusive means of responding to an exigent situations; they need only act within that range of conduct we identify as reasonable."); Menuel v. City of Atlanta, 25 F.3d 990, 996-97 (11th Cir. 1994)("[T]he Fourth Amendment does not require officers to use the least intrusive alternatives in search and seizure cases. The only test is whether what the police officers

actually did was reasonable."); Plakas v. Drinski, 19 F.3d 1143, 1149 (7th Cir. 1994)("We do not believe the Fourth Amendment requires the use of the least or even a less deadly alternative so long as the use of force is reasonable under *Garner v. Tennessee* [sic] and *Graham v. Connor*.").

"Thus, the clearly established law in the Tenth Circuit holds that the Fourth Amendment does not require an officer to use the least or a less forceful alternative." Jonas v. Bd. of Comm'rs of Luna Cty., 699 F. Supp. 2d 1284, 1296 (D.N.M. 2010)(Browning, J.). See, e.g., Blossom v. Yarbrough, 429 F.3d at 968 (quoting Medina v. Cram, 252 F.3d at 1133)("It is well settled that 'the reasonableness standard does not require that officers use alternative, less intrusive means' when confronted with a threat of serious bodily injury."); Jiron v. City of Lakewood, 392 F.3d 410, 414 (10th Cir. 2004)(stating that, in police-shooting case, officers are not required to use alternative, less intrusive means if their conduct is objectively reasonable). See also Roy v. Inhabitants Lewiston, 42 F.3d 691, 695 (1st Cir. 1994)("[I]n close cases, a jury does not automatically get to second guess these life and death decisions, even though plaintiff has an expert and a plausible claim that the situation could better have been handled differently."); Diaz v. Salazar, 924 F. Supp. 1088, 1100 (D.N.M. 1996)(Hansen, J.). Moreover, the reasonableness standard does not require that officers use "alternative 'less intrusive' means." Illinois v. Lafayette, 462 U.S. at 647-48. The Court has also rejected the consideration of a less intrusive alternative to end a threat. See Chamberlin v. City of Albuquerque, No. 02-0603, 2005 WL 2313527, at *2 (D.N.M. July 31, 2005)(Browning, J.)(precluding the plaintiff's police procedures expert from testifying at trial regarding alternative less intrusive means).

## LAW REGARDING THE NEW MEXICO TORT CLAIMS ACT

The New Mexico Tort Claims Act is the exclusive remedy for torts committed by any governmental entity or public employee. See N.M. Stat. Ann. § 41-4-17. A plaintiff may not,

however, sue a governmental entity, or its employees or agents, unless the plaintiff's cause of action fits within one of the immunity waivers enumerated in the statute.  See N.M. Stat. Ann. § 41-4-17.  Nor may a plaintiff sue a governmental entity or its employees for damages arising out of violations of rights under the New Mexico Constitution unless the New Mexico Tort Claims Act contains a waiver of immunity.  See, e.g., Barreras v. N.M. Corr. Dep't, 2003-NMCA-027, ¶ 24, 62 P.3d 770, 776 ("In the absence of affirmative legislation, the courts of this state have consistently declined to permit individuals to bring private lawsuits to enforce rights guaranteed by the New Mexico Constitution, based on the absence of an express waiver of immunity under the Tort Claims Act"); Chavez v. City of Albuquerque, 1998-NMCA-004, ¶ 11, 952 P.2d 474, 477 (noting that a plaintiff cannot seek damages for violations of rights under the New Mexico Constitution against a city or its employees or agents unless the New Mexico Tort Claims Act waives immunity); Rubio v. Carlsbad Mun. Sch. Dist., 1987-NMCA-127, ¶ 14, 744 P.2d 919, 922 (holding that no waiver of immunity exists for damages arising out of alleged educational malpractice claim against a school board).  Thus, a plaintiff's claim must be dismissed if it does not fall under a waiver enumerated in the New Mexico Tort Claims Act.  See Kreutzer v. Aldo Leopold High Sch., 2018-NMCA-005, ¶ 65, 409 P.3d 930, 945.

## NEW MEXICO LAW REGARDING THE TORTS OF ASSAULT AND BATTERY

New Mexico courts have stated that "the elements of civil and criminal assault and battery are essentially identical."  State v. Ortega, 1992-NMCA-003, ¶ 12, 827 P.2d 152, 155.  A person is liable for the intentional tort of simple battery when the person intentionally causes bodily contact to the plaintiff in a way not justified by the plaintiff's apparent wishes or by a privilege, and the contact is harmful or offensive to the plaintiff.  See 1 Dan B. Dobbs, The Law of Torts § 28, at 52-53 (2000)("The defendant is subject to liability for a simple battery when he

intentionally causes bodily contact to the plaintiff in a way not justified by the plaintiff's apparent

wishes or by a privilege, and the contact is in fact harmful or against the plaintiff's will."  (citing

Restatement (Second) of Torts § 13)).

> Under New Mexico law, wherein the Restatement of Torts reigns, one commits a
> battery when "(a) he acts intending to cause a harmful or offensive contact with the
> person of the other or a third person, or an imminent apprehension of such a contact,
> and (b) an offensive contact with the person of the other directly or indirectly
> results."

Sisneros v. Fisher, 685 F. Supp. 2d 1188, 1220-21 (D.N.M. 2010)(Browning, J.)(quoting Desmare

v. New Mexico, No. CIV 07-0199 JB/RHS, 2007 WL 5231690, at *4 (D.N.M. Aug. 14,

2007)(Browning, J.)).  See Restatement (Second) of Torts § 18 ("An actor is subject to liability to

another for battery if (a) he acts intending to cause a harmful or offensive contact with the person

of the other or a third person, or an imminent apprehension of such a contact, and (b) an offensive

contact . . . results.").[31]  Accord State v. Ortega, 1992-NMCA-003, ¶ 10, 827 P.2d at 155 (noting

---

[31]The Court often looks to the New Mexico Civil Uniform Jury Instructions for guidance
on New Mexico state law.  See, e.g., Coffey v. United States, 906 F. Supp. 1114, 1186 n.33
(D.N.M. 2012)(Browning, J.)("The Supreme Court of New Mexico's adoption of uniform jury
instructions proposed by standing committees of the Court establishes a presumption that the
instructions are correct statements of law."  (citing State v. Wilson, 1994-NMSC-009, ¶ 5, 867
P.2d 1175, 1178)).  The Civil Uniform Jury Instruction for the intentional torts of assault and
battery, however, states that the Committee concluded that the New Mexico law regarding the torts
was not clearly developed to warrant an instruction.  See Civ. U.J.I. 13-1624 N.M.R.A., Committee
Commentary (noting that the Committee "spent much time over a period of several months
studying the matter of intentional torts," but ultimately "concluded that there was insufficient New
Mexico law on assault and battery to guide the committee on this subject and that too much reliance
had been placed upon the law of other jurisdictions on assault and battery to include such
instructions in this work").

The Court has carefully searched New Mexico state caselaw on the intentional torts of
assault and battery, and, in addition, considered the reference to Restatement (Second) of Torts
§ 18 in State v. Ortega.  The Court notes that the Court of Appeals of New Mexico, in Yount v.
Johnson, 1996-NMCA-046, 915 P.2d 341, cites to W. Page Keeton et al., Prosser and Keeton on
the Law of Torts (5th ed. 1984) and the Restatement (Second) of Torts for the proposition that
"[c]onsent is a defense for intentional torts like assault and battery."  Yount v. Johnson, 1996-
NMCA-046, ¶ 17, 915 P.2d at 346.  The Court has previously noted that "New Mexico courts

that the "elements of civil and criminal assault and battery are essentially identical," and comparing "[t]he elements of [N.M. Stat. Ann.] Section 30-22-24(A)" with Restatement (Second) of Torts § 18).[32]  "An 'officer can be held liable for assault and battery if he uses excessive force.'" Adegbuji v. Middlesex Cty., No. CIV A 03CV-1757 PGS, 2006 WL 2806289, at *12 (D.N.J. Sept. 28, 2006)(Sheridan, J.)(quoting Mantz v. Chain, 239 F. Supp. 2d 486, 498 (D.N.J. 2002)(Brotman, J.)).

As to the intent required to commit a battery, Professor Dobbs notes that the Restatement (Second) of Torts is "ambiguous" whether "the plaintiff shows intent by showing merely an intent to touch that turned out to be offensive or harmful or whether she must show that the harm or offense was intended."  Dobbs, supra, § 30, at 58.  It is clear, however that "an intent to touch in a way the defendant understands is not consented to is sufficient.  So is an actual intent to harm." Dobbs, supra, § 30, at 58.  For the contact required, Professor Dobbs notes that, because the intentional tort of battery rose out of the common-law action of trespass, harm is not required. Accord Selmeczki v. N.M. Dep't of Corr., 2006-NMCA-024, ¶ 29, 129 P.3d 158, 167 ("It is black-letter law that causing an offensive touching, even indirectly to another's clothing and not resulting in injury, is the tort of battery.").  Rather, "[t]he gist of battery is that the plaintiff has been touched,

---

often look to the law as stated in the Restatement (Second) of Torts."  Coffey v. United States, 906 F. Supp. 2d at 1169 n.31 (citing Montanez v. Cass, 1975-NMCA-142, ¶ 46, 546 P.2d 1189, 1195 ("It has long been the policy of our courts to follow in the footsteps of the Restatement of Torts, 2d."), rev'd in part on other grounds sub nom. N.M. Elec. Serv. Co. v. Montanez, 1976-NSMC-028, 551 P.2d 634).  The Court thus follows the New Mexico courts' guidance, relying on Dobbs, supra, the West Group's successor treatise to Prosser and Keeton on the Law of Torts, discussing the Restatement (Second) of Torts' definition of battery, for the elements of the intentional tort of battery.

[32]The Court notes that the Supreme Court of New Mexico agrees with State v. Ortega's construction of New Mexico's battery statute, as provided in State v. Padilla, 1997-NMSC-022, ¶ 7, 937 P.2d 492, 494.

intentionally, in a way that she has not even apparently consented to and that is not justified by some generally recognized privilege." Dobbs, supra, § 29, at 55. Thus, for purposes of battery, a harmful touching is sufficient, but not necessary. Cf. Garety v. Demers, 1978-NSMC-097, ¶ 55, 589 P.2d 180, 191 (in the context of whether medical malpractice is distinct from the tort of battery, the Supreme Court of New Mexico noted: "As to causation in a battery action, the tort of battery is the wrongful touching of the [plaintiff's] body which by itself gives the patient a claim for substantial damages").

In Selmeczki v. New Mexico Department of Corrections, the Court of Appeals of New Mexico held that a disgruntled corrections department officer committed the tort of battery when the officer hit visitors to his office with a stack of coins. See 2006-NMCA-024, ¶ 29, 129 P.3d at 167. The visitors' testimony was that the officer "rose up part way from a seated position behind a desk and forcefully slapped a stack of five to ten coins toward both visitors, which resulted in the coins striking them both on the legs." 2006-NMCA-024, ¶ 6, 129 P.3d at 1661. The officer's version was quite different; he "denied slapping or striking the coins at [the visitors] but claimed that he only 'nudged or dropped' them off the desk, a gesture he admitted was probably 'not prudent.' He denied any advance planning, claiming it was a 'spur of the moment' act." 2006-NMCA-024, ¶ 7, 129 P.3d at 161. The testimony elicited at trial was that "no injury or harm was likely from the coins being launched at [the visitors]." 2006-NMCA-024, ¶ 29, 129 P.3d at 167. The Court of Appeals of New Mexico concluded that, regardless whether the officer "did not 'meaningfully' commit a civil battery," he was liable, as "[i]t is black-letter law that causing an offensive touching, even indirectly to another's clothing and not resulting in injury, is the tort of battery." 2006-NMCA-024, ¶ 29, 129 P.3d at 167.

<u>ANALYSIS</u>

The Court concludes that, on the undisputed material facts in the record, and construing the disputed facts for which O'Farrell offers competent, admissible evidence in the light most favorable to the non-movant, O'Farrell, there is a genuine issue of material fact whether Day violated O'Farrell's clearly established constitutional rights.  Day is not, therefore, entitled to qualified immunity.  The Court will not dismiss Count III and Count V, because there is an underlying constitutional violation.  The Court also does not grant the County Defendants' request to dismiss Count IV, because it asserts a valid claim under the New Mexico Tort Claims Act for common law assault and battery.

**I.      ON THE UNDISPUTED MATERIAL FACTS IN THE RECORD, AND CONSTRUING THE DISPUTED FACTS FOR WHICH O'FARRELL OFFERS COMPETENT, ADMISSIBLE EVIDENCE IN THE LIGHT MOST FAVORABLE TO THE NON-MOVANT, O'FARRELL, THERE IS A GENUINE DISPUTE OF MATERIAL FACT WHETHER DAY VIOLATED O'FARRELL'S CLEARLY <u>ESTABLISHED CONSTITUTIONAL RIGHTS.</u>**

When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  See <u>Riggins v. Goodman</u>, 572 F.3d at 1107.  Day violated O'Farrell's constitutional rights by using excessive force against her when O'Farrell was compliant and non-threatening.  This constitutional violation is clearly established in the Tenth Circuit.  Day is therefore not entitled to qualified immunity.

**A.      THERE IS A GENUINE ISSUE OF MATERIAL FACT WHETHER DAY VIOLATED O'FARRELL'S CONSTITUTIONAL RIGHTS**

"The Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment."  <u>Graham v. Connor</u>, 490 U.S. 386, 395 n.10 (1989).  To evaluate whether a pretrial detainee's excessive force claim alleges a constitutional violation, the Tenth Circuit

analyzes "'(1) the relationship between the amount of force used and the need presented; and (2) the extent of the injury inflicted.'"  Porro v. Barnes, 624 F.3d 1322, 1326 (10th Cir. 2010)(quoting Roska v. Peterson, 328 F.3d 1230, 1243 (10th Cir. 2003)).  The Tenth Circuit applies a different standard for the Due Process violations that pretrial detainees allege than for the Eighth Amendment violations that convicted prisoners allege.  See Ullery v. Bradley, 2020 WL 611070, at *10, __ F. 3d __ (10th Cir. 2020).  A court analyzing a Due Process excessive force claim must still determine whether the alleged wrongdoing is objectively reasonable; however, an officer's subjective intent in using force is not required to prove a Due Process violation in these circumstances.  See Kingsley v. Hendrickson, 135 S. Ct. at 2475 (concluding that an officer's subjective intent is irrelevant to an excessive force claim, because "most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically'"); Ullery v. Bradley, 2020 WL 611070, at *10 n.5, __ F. 3d __ ("Thus, following Kingsley, we no longer apply an identical analysis to an excessive force claim regardless of whether the claim arises under the Fourteenth or Eighth Amendment."); Colbruno v. Kessler, 928 F.3d 1155, 1163 (10th Cir. 2019)("In particular, there is no subjective element of an excessive-force claim brought by a pretrial detainee.").

In this case, the needs that O'Farrell presented were minor compared to the amount of force Day used, and Tenth Circuit precedent suggests that a reasonable jury could conclude that the force was excessive.  Day did not wield the Taser before firing it at O'Farrell for the first time, and she fired it at O'Farrell without warning.  See MSJ ¶ 17, at 5; supra n.12, at 7.  Day also fired the Taser the second time without warning O'Farrell.  See Response ¶ 8, at 7; supra n. 13, at 7-8. The Tenth Circuit has previously concluded that Taser use without warning weighs heavily in favor of concluding that a constitutional violation has occurred.  See Casey v. City of Fed. Heights, 509

F.3d at 1285 (noting that failure to warn the case's plaintiff before using the Taser was "especially troubling").  The Tenth Circuit noted that, while Taser use is justified where an inmate or detainee is violent, "it is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force -- or a verbal command -- could not exact compliance."  Casey v. City of Fed. Heights, 509 F.3d at 1286.  See Porro v. Barnes, 624 F.3d at 1329 ("The use of tasers in at least *some* circumstances -- such as in a good faith effort to stop a detainee who is attempting to inflict harm on others -- can comport with due process." (emphasis in original)).

In addition, no undisputed facts imply that O'Farrell posed a threat to Day, Garcia, or anyone else.  Viewing the facts in the light most favorable to O'Farrell, O'Farrell had her back turned to Day and her hands on the wall when she was Tasered for the first and second time,  see MSJ ¶ 16, at 5; Response ¶ 8, at 7; supra at 5-6, was reaching for her bra that was not near anyone in the room when she was Tasered the third time, see MSJ ¶ 19, at 5-6; supra n.15, at 8-9, and was on the ground convulsing when Day Tasered her for the fourth time, see Response ¶ 8, at 7-8; supra at 9-10.  Other than reaching for her bra after being told she could not have it, O'Farrell did not disobey any of Day's commands.  See Response ¶ 8, at 6-7; MSJ ¶ 19, at 6; supra at 5-6, 8-9. A reasonable jury could conclude that "a lesser degree of force would have exacted compliance and that this use of force was disproportionate to the need."  Estate of Booker v. Gomez, 745 F.3d at 424.  See Cavanaugh v. Woods Cross City, 625 F.3d 661, 665 (10th Cir. 2010)(denying summary judgment after concluding that a reasonable jury could "conclude that [the plaintiff] did not pose an immediate threat" to anyone and was not actively resisting before being Tasered). Accordingly, the Court concludes that, on these facts, when viewed in light most favorable to O'Farrell, Day violated O'Farrell's constitutional rights; there is a genuine issue of material fact preventing summary judgment in the County Defendants' favor.

## B.   O'FARRELL'S   CONSTITUTIONAL   RIGHTS   ARE   CLEARLY ESTABLISHED.

The Complaint alleges a violation of O'Farrell's clearly established rights.  O'Farrell first proposes, as clearly established law, that "a law enforcement officer may not use force on a compliant suspect already under the officer's control and not resisting detention or trying to flee." Response at 17 (citing Baker v. City of Hamilton, 471 F.3d at 607; Olsen v. Layton Hills Mall, 312 F.3d at 1314-15; Dixon v. Richer, 922 F.2d at 1462-63).  In reply, the County Defendants warn that "[n]one of the cases cited by Plaintiff involves a Fourteenth Amendment claim arising under the test announced in Kingsley" and argue that the undisputed material facts show that O'Farrell was neither compliant nor non-threatening.  Reply at 8-9.

There is a Tenth Circuit case closely on point resolving whether Day violated clearly established law.  See Estate of Booker v. Gomez, 745 F.3d at 428.  As it concluded that corrections officers' constitutional violations -- including using a Taser on a prone, subdued inmate -- were against clearly established law, the Tenth Circuit in Estate of Booker v. Gomez stated that "'there undoubtedly is a clearly established legal norm' precluding the use of violent physical force against a criminal suspect or detainee 'who already has been subdued and does not present a danger to himself or others.'"   Estate of Booker v. Gomez, 745 F.3d at 428 (quoting Harris v. City of Circleville, 583 F.3d 356, 367 (6th Cir. 2009)).  This Tenth Circuit case resolves the issue, as the use of a Taser constitutes violent physical force, see Estate of Booker v. Gomez, 745 F.3d at 423-24, O'Farrell was a detainee, see MSJ ¶¶ 1-2, at 3; supra 2, and, under the facts as the Court must view them on summary judgment, O'Farrell was compliant and did not represent a danger to anyone, see Response ¶ 8, at 6-8; supra 5-6, 8-9.  It was also decided in March, 2014, well before September 29, 2015, when this case's underlying events occurred and has been essentially

reaffirmed since then.  See Perea v. Baca, 817 F.3d 1198, 1204 (10th Cir. 2016)("The repeated use of the Taser against a subdued offender is clearly unreasonable and constitutes excessive force under the Fourth Amendment.").  The Tenth Circuit's statement in the 2009 case Casey v. City of Federal Heights that it did not know "of any circuit that has upheld the use of a Taser immediately and without warning against a misdemeanant" like the plaintiff who had not resisted arrest or been warned before he was Tased also establishes the law at the time of this case's events.  509 F.3d at 1286.  Although these cases settle the question, the Court notes that, contrary to the County Defendants' arguments, O'Farrell may rely on excessive force cases outside the Fourteenth Amendment context to show the law was clearly established.  See Estate of Booker v. Gomez, 745 F.3d at 428 (rejecting an argument that a plaintiff could not rely on Fourth Amendment excessive force cases to show law was clearly established under the Fourteenth Amendment, because "the Graham Fourth Amendment excessive force factors are consistent with the disproportionate force analysis under the Fourteenth Amendment").

The County Defendants cite other cases where courts conclude that a Taser use was not against clearly established law, but these do not distinguish O'Farrell's case from the principle the Tenth Circuit articulated in Estate of Booker v. Gomez.  In Stevenson v. Cordova, for example, the Tenth Circuit reviewed the constitutionality of Taser use against a plaintiff who was neither subdued nor harmless at the time.  See 733 F. App'x at 941.  In that case, two female corrections officers approached Stevenson in an open prison vestibule with other inmates walking around, spoke with him, and ordered that he submit to being handcuffed.  See 733 F. App'x at 941.  Stevenson refused to be handcuffed and "first raised both of his arms above his head.  Then as the two officers attempted to force him to submit, he dropped to his knees and ultimately lay down on the floor with his arms beneath his body."  733 F. App'x at 941.  Likewise, Youngquist v. Board

of County Commissioners for Curry County, New Mexico concerned "an arrestee who would not comply with verbal instructions to participate in the change out and strip search, and who further pulled away when [an officer] attempted to use a small amount of force by removing Youngquist's clothing for her."  2016 WL 9725196, at *5.  Unlike this case, the plaintiffs in Stevenson v. Cordova and Youngquist v. Board of County Commissioners for Curry County, New Mexico both refused to obey verbal instructions, and they resisted officers attempts to physically enforce compliance with lesser means before resorting to a Taser.  See 733 F. App'x at 941; 2016 WL 9725196, at *5.  Qualified immunity is not appropriate in cases such as this case, where a "detainee 'who already has been subdued and does not present a danger to himself or others,'" alleges excessive force claims.  Estate of Booker v. Gomez, 745 F.3d at 428 (quoting Harris v. City of Circleville, 583 F.3d at 367).

## II.     THE COURT WILL DISMISS O'FARRELL'S CLAIM ALLEGING AN UNCONSTITUTIONAL DENIAL OF MEDICAL CARE.

O'Farrell asserts a § 1983 claim against Day and Garcia for denying her medical care after she was shot with Day's Taser.  She alleges that they "acted willfully, knowingly, and purposefully and/or with indifference to deprive Ms. O'Farrell of her constitutional rights."  Complaint ¶ 65, at 9.  The County Defendants argue that "there is no evidence that MDC staff members denied Ms. O'Farrell access to medical care, delayed Ms. O'Farrell's medical treatment, or interfered with the treatment provide to Ms. O'Farrell."  MSJ at 22.  They further argue that, even if O'Farrell could show that they had disregarded a serious risk of harm, the law was not clearly established that "Ms. O'Farrell was subjected to deliberate indifference when she was taken to the medical ward following the incident at issue, had her vital signs monitored, her injuries were documented, and she was cleared medically from being Tased."  MSJ at 24.  O'Farrell did not respond to these

arguments in her Response.  <u>See</u> Response.  At the hearing, the parties agreed that the Court should dismiss this claim.  <u>See</u> Tr. at 24:22-25:5 (Court,  Rahn).

The Court agrees that it should dismiss this claim.  Failure to properly treat a serious medical condition can constitute deliberate indifference, <u>see</u> <u>Sealock v. Colorado</u>, 218 F.3d 1205, 1211 (10th Cir. 2000), but O'Farrell was taken to see a nurse after the strip search, <u>see</u> MSJ ¶ 53, at 11; supra at 10.  Further, O'Farrell cites no case, and the Court has not found any, that suggests that it was clearly established that O'Farrell is entitled to greater medical treatment than she received.  The Court, therefore, will dismiss this claim.

## III.  THE COURT WILL NOT DISMISS O'FARRELL'S CLAIMS UNDER <u>MONELL V. DEPARTMENT OF SOCIAL SERVICES OF NEW YORK CITY</u>.

The County Defendants argue that, if the Court concludes that Day and Garcia are entitled to qualified immunity for Counts I and II, then the Court must dismiss O'Farrell's claims for municipal liability under <u>Monell v. Department of Social Services of New York City</u>.  <u>See</u> MSJ at 25.  The County Defendants do "not attack the factual basis for [O'Farrell's] claims, i.e., whether the County had a policy and whether individual Defendants' actions were caused by that policy." Reply at 9.  The County Defendants do not dispute any of the additional material facts that O'Farrell asserted in her Response, including that "MDC staff continued their policy and practice of using force against inmates within secured confinement barriers who were not in the process of inflicting serious injury to themselves, other inmates, or damaging department property after the April 9, 2015 Use of Force Directive," Response ¶ C14, at 16, and that "MDC Staff continued their policy and practice of using force against inmates to secure compliance with officer commands without prior attempts to de-escalate conflict after the April 9, 2015 Use of Force Directive and after the implementation of MDC Policy § 8:36-4," Response ¶ C15, at 16; <u>see</u> Reply

at 6.[33]  O'Farrell has supported these asserted facts with a summary table she attached to the Response detailing fourteen other incidents, see Prior Use of Force Incidents Document at 1-2, and states that the parties are coordinating the production of further documents regarding Taser use and strip searches at MDC, see Response at 22.  Because they do not attack the factual justifications for this claim, the County Defendants' sole argument in favor of summary judgment is that, without liability against individual officers, O'Farrell cannot assert liability against Bernalillo County.  See Reply at 9.

The Court has already concluded above that summary judgment in favor of the individual defendants is not appropriate.  Under O'Farrell's version of events, Day's Taser uses against O'Farrell while she was compliant violated O'Farrell's clearly established constitutional rights. This use was in accordance with MDC policy at the time to use force against detainees who did not pose serious risks of harm and without first attempting to de-escalate conflict.  See Response ¶¶ 12-15, at 15-16; supra at 14-15.  Viewing the facts in the light most favorable to O'Farrell, O'Farrell has shown the two elements of a Monell claim: that a municipal employee committed a constitutional violation, and that a municipal policy or custom was a motivating force behind the violation.  See Myers v. Okla. Cty. Bd. of Cty. Comm'rs, 151 F.3d at 1318 (citing Monell, 436 U.S. at 694).  Accordingly, the Court will not dismiss Count III's claim for municipal liability against Bernalillo County.

---

[33]MDC issued the April 9, 2015, Use of Force Directive before this case's events, which occurred on September 29, 2015.

## IV.     THE COURT WILL NOT DISMISS O'FARRELL'S CLAIMS UNDER THE NEW MEXICO TORT CLAIMS ACT.

In Count IV, O'Farrell alleges "violations of the New Mexico Tort Claims Act in violation of 42 U.S.C. § 1983." Complaint at 10. She alleges that Day "intentionally touched and applied force to Ms. O'Farrell when she tased her," and that Day's "use of force was unreasonable in light of the totality of the circumstances." Complaint ¶¶ 74-75, at 10. She also alleges that "Garcia had a duty to stop Defendant Day's unlawful conduct" and that Garcia "is responsible for the batteries." Complaint ¶¶ 76-77, at 10. O'Farrell asserts that these are torts "for which immunity has been waived by NMSA 1978 § 41-4-4 *et seq*." Complaint ¶ 79, at 11.

The parties have thoroughly debated this claim. The County Defendants argue that this pleading "raises the question of whether a state tort violation can also result in a violation of federal law." MSJ at 26. They contend that, other than Count IV's title, O'Farrell has not pleaded a federal law claim. See MSJ at 27. The County Defendants argue that the Court should dismiss Count IV if it concludes that they are entitled to qualified immunity in Counts I and II. See MSJ at 27.

In response, O'Farrell argues that she has asserted assault and battery claims under the New Mexico Tort Claims Act against Day. See Response at 23-24. She contends that these are torts for which the New Mexico Tort Claims Act waives sovereign immunity. See Response at 23 (citing N.M. Stat. Ann. § 41-4-2). She also argues that corrections officers are entitled to immunity against recklessness, gross negligence, and negligence claims, "so long as they use only that force that is reasonably necessary," but they may be sued if they fail to implement policies related to their use of force. Response at 24 (citing Weinstein v. City of Santa Fe ex. rel Santa Fe Police Dep't, 1996-NMSC-021 ¶¶ 32-33, 42, 916 P.2d at 1321-23). She asserts that Day used

- 66 -

unreasonable force and also did not follow MDC's Use of Force Directive.  See Response at 25.
In reply, the County Defendants argue that, O'Farrell's Response "create[s] a moving target by
changing her legal theories and claims from those set forth in her Complaint."  Reply at 10.  They
assert that in all cases "interpreting law enforcement liability under the NMTCA, any negligence
must result in the commission of an enumerated and intentional tort."  Reply at 10.  They conclude
that, even assuming O'Farrell "has alleged a claim for assault and battery under the NMTCA, these
claims should be dismissed because as noted above, Sgt. Day used objectively reasonable force."
Reply at 10.

While O'Farrell could have more precisely pled Count IV in the Complaint, the Court will
interpret it at as an allegation for the common law torts of assault and battery under the New
Mexico Tort Claims Act.  See MSJ at 27 ("[O]ther than the title for Count IV, Plaintiff has not
pleaded a federal clam.").  New Mexico waives sovereign immunity for these intentional torts
when law enforcement officers commit them.  See N.M. Stat. Ann. § 41-4-12.  The County
Defendants admit that Day intentionally touched and applied force to O'Farrell when she Tasered
her.  See County Defendants' Answer to Plaintiff's First Amended Complaint for Violations of
Civil Rights Pursuant to 42 U.S. § 1983, For Violations of the New Mexico Tort Claims Act and
For Damages at 11, filed October 27, 2017 (Doc. 6).  Viewing the disputed facts in the light most
favorable to the non-movant, O'Farrell, the Court concludes that the tort's other element -- that
the touch be offensive -- is satisfied.  See, e.g., Response ¶ 8, at 7-8; supra at 7.  See also
Restatement (Second) of Torts § 18; State v. Ortega, 1992-NMCA-003, ¶ 10, 827 P.2d at 155.  The
Court, accordingly, the Court will not dismiss Count IV.

## V.      THE COURT WILL NOT DISMISS O'FARRELL'S CLAIM FOR SUPERVISOR LIABILITY.

The Complaint's Count V alleges that Bernalillo County incorrectly informed or led the individual defendants to believe that they could use excessive force during strip searches.  See Complaint ¶¶ 84-85, at 11-12.  It further asserts that Bernalillo County is vicariously liable for the individual Defendants' torts while they were acting within the scope of employment.  See Complaint ¶ 89, at 12.   In the MSJ, the County Defendants argue that, if the Court concludes that Day and Garcia are entitled to qualified immunity for Counts I and II, then the Court must dismiss O'Farrell's claims for vicarious liability.  See MSJ at 25.  They argue that, "absent liability for the underlying conduct, there can be no" claims against Bernalillo County.  Reply at 9.  The Court concluded above that it would construe O'Farrell's Count IV as a claim for common law assault and battery rather than as an action under § 1983.  The Court will not, therefore, dismiss Count V against Bernalillo County, because New Mexico municipalities face vicarious liability for their employee's torts when they have direct supervisory responsibility or control over their employees and holding the municipality liable would not be inherently unfair.  See Weinstein v. Santa Fe ex rel. Santa Fe Police Dep't, 1996-NMSC-021, ¶¶ 15-17, 916 P.2d at 1318-19.

**IT IS ORDERED** that the County Defendants' Motion for Summary Judgment Based on Qualified Immunity; Dismissal of Counts I-V of Plaintiff's Complaint, filed March 1, 2019 (Doc. 45), is granted in part and denied in part.  The Court dismisses Count II from the action, but it does not dismiss any other claim.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Robert Gorence
Louren M. Oliveros
Amye Gayle Green
Gorence & Oliveros, P.C.
Albuquerque, New Mexico

 *Attorneys for the Plaintiff*

Luis E. Robles
Taylor Sauer Rahn
Douglas E. Gardner
Robles, Rael & Anaya, P.C.
Albuquerque, New Mexico

 *Attorneys for Defendants Bernalillo County, LaDonna Day, and Kassandra Garcia*

Esteban A. Aguilar, Jr.
 City Attorney for the City of Albuquerque
Kristin J. Dalton
 Assistant City Attorney
City of Albuquerque Attorney's Office
Albuquerque, New Mexico

 *Attorneys for Defendant City of Albuquerque*